LANE *v.* AU SABLE ELECTRIC CO.

1. LANDLORD AND TENANT — TRESPASS — EVICTION — MASTER AND SERVANT.

   Evidence that plaintiff's employer, after plaintiff had joined a strike, notified him to quit and surrender up the house and premises that he occupied as a part of his employment, and thereupon sent men to put him out, who, after advising him why they came, removed his furniture to the street, and that the plaintiff cautioned them against damaging it, but they injured the furniture to the extent of $14.50, *held*, to be insufficient to show excessive force or forcible entry and detainer, although plaintiff's judgment for the damage done by their neglect is allowed to stand.

2. SAME—MASTER AND SERVANT.

   The relation of the servant was not that of tenant to landlord, where he occupied a house on the premises of his employer as a part of the compensation paid to him. It was an incident of his hiring and his right to the use of the premises ceased when he joined a strike and ceased to perform his duties.

3. SAME—DAMAGES—CONTRACT.

   Accordingly, plaintiff could not recover damages for being evicted and his goods set out of the house, upon his claim of excessive force, nor could he recover damages because of mortification, injured feelings, etc.

Error to Muskegon; Sullivan, J. Submitted April 20, 1914. (Docket No. 84.) Decided June 1, 1914.

Case by William Lane against the Au Sable Electric Company for an unlawful eviction. Judgment for plaintiff on a directed verdict for less than the damages claimed, and he brings error. Affirmed.

*Jerome E. Turner*, for appellant.

*Cross, Vanderwerp, Foote & Ross (W. S. Westerman*, of counsel), for appellee.

MOORE, J. This suit is brought by William Lane to recover damages which he alleges he sustained by reason of an unlawful eviction of himself and family from certain premises located in the city of Muskegon Heights, owned by defendant.

The plaintiff was chief operator of the substation of the defendant at Muskegon Heights, when a strike came on. His testimony as to the occurrences which gave rise to this litigation is, in substance, as follows:

"I lived there and operated the station, used the house as a dwelling house. The time of this strike was the 27th day of May, 7 o'clock in the evening. I don't just remember how long I remained in the employ of the company—after the strike, after the boys walked out. I think it was until about 9 o'clock in the morning of the 28th, the next day. I did not have any talk at that time with any of the officers of this defendant; I don't know that I did. On the 3d day of June, in the forenoon, we were still on the place and in possession of the dwelling house. On that day we were eating dinner. * * * We wasn't up from the table, but we were through, and in come Mr. Stewart and Mr. Burton and asked me if I had received notice to vacate, and I told them that I had, and he asked me if I was going to move, I think. No, he said, 'You have received your notice and you have not vacated yet.' I said, 'No.' He said, 'We will have to set your furniture out on the street.' And he then asked me if I had any place to go, and I told him no, that I didn't. * * * He said that he would take my wife and children to the hotel, but he didn't say what hotel, or who was to pay the bill, and I told him, 'No;' that I could look after my wife; that it wasn't necessary. And he and Mr. Stewart went out of the house. I don't think they were out over 20 minutes before in came these men and began to tear up and set things out. I can't say that I counted them, but I would say that there was eight or nine men came in. They were strangers to me. It took them about an hour and a half to set our goods in the street. I was there myself all the time while this was being done; also my wife and children. * * * "

On cross-examination:

"There is a passageway between the dwelling house and the substation, as shown there; it is sort of an alleyway, so that you can pass right from the dwelling house into the substation, or from the station into the dwelling house. It was used for convenience, or had been so used, in performing my duties there as chief operator. * * * Shortly before I came here the chief operator there at the substation died, and the position was offered to me. I was receiving $60 a month in Grand Rapids and provided my own place of living; the company didn't furnish me a place to live in in Grand Rapids; so when I came over here my compensation was $55 a month and the use of this house, which Mr. Gilbert thought was worth $5 or $10 a month, and the company also furnished the lights and water, and there was a telephone in the house, which rental wasn't paid by me. It was furnished for my use. There was also a telephone in the substation—the Citizens' and Bell was extended from the house to the substation, and the private, the power company's private, phone was extended from the substation to the house. * * * I performed the last of my duties there as chief operator on the 27th day of May, about 7 o'clock in the evening; then quit and went on a strike; in other words, I walked out with the other strikers. Did not send any notice to the company. There were others at the station capable of performing my duties. One of the strikers, the operator that had been there with me, he walked out, too. I and my helper, or whoever operated there at the substation, walked out at night at 7 o'clock, without any notice to the company whatever. I continued to live in the dwelling house. That substation is supposed to be opened all night, a man on duty there all night; I locked up the station. We had the keys and returned them afterwards to the operator, Mr. Essex. I didn't deliver the keys to anybody that night. When we walked out in that way it left the city and everything in darkness. I know that Mr. Stewart, the local manager here, and Douglas Erwin came out there and got in and turned on the lights; at the time I was down the street. I claimed that the company discharged me afterwards, not until after I had gone on

a strike and quit of my own accord, and after I had gone out in this way, locked up the substation, nobody there to turn on the lights, and refused to vacate the house used in connection with the substation. I did not quit my employment there because I had any complaint myself against the company. I was in the Union and was in sympathy with the striking linemen. If you are a mind to call it so, it was sort of a compulsory matter with me. Had no personal grievance against the defendant at that time. Mr. Burton of the defendant company gave me no verbal notice to vacate that dwelling house. I was not asked to vacate on the 28th, the next day after we went out, but I did get a written notice; it was served upon my wife on the 29th, when I got home she delivered it to me. That is the notice that was served:

" 'To WILLIAM LANE:

" '*Sir:*

" 'You are hereby notified to quit and surrender up the dwelling house and premises which you have occupied incident to your employment by this company. Said dwelling house and premises being the dwelling house and premises situated on block thirty-seven (37) plat B, village (now city) of Muskegon Heights, Michigan, the same adjoining the substation of this company on Peck street in said city of Muskegon Heights.

" 'Dated this 29th day of May, 1913.

" 'AU SABLE ELECTRIC COMPANY,
"By S. STEWART.'  *  *  *

"The Au Sable Electric Company did not have any local manager here that I know of. I did not get a verbal notice before this written notice was served on me to get out of that house. Mr. Gilbert called me on the telephone, I remember, and he asked me when I was going to move; that was all the notice that I got. He didn't tell me to vacate it. I think it was the morning of the 29th or 28th. I told him that I didn't have any place to go, and that I would see what I could do. I had the intention of moving at the time. I did not consult a lawyer and conclude that I would stay, nor take any legal advice, before this notice was served upon me, or before my goods were taken out. I was told not to move, but not by a lawyer. It came from the Union.  *  *  *  I swear I didn't hear any messages over the telephone. I heard messages, but

not over the telephone—heard one side of the conversation, the man who was talking. I could hear through the corridor; the telephone switchboard is at one end of the corridor, and I could hear through the corridor. I have listened on purpose to hear what was going on and would report to the Union. * * * Notwithstanding whatever investigation I had made in regard to procuring a dwelling house elsewhere, I had made up my mind to stay right there in this little house, and I was doing that on the theory that I had a right to stay there. It was four days after I got this notice before I was set out. The goods were not actually set out until after dinner of June 3d. In the house at the time we took dinner was my wife and children and myself, that was all. * * *

"Mr. Burton said to me he wanted to know if I had had notice to vacate. I told him I had. Well, he said that I hadn't moved, and that they would be compelled to set my goods out on the street. He did not tell me that it would be a good deal better if I went on and moved out myself. I didn't tell him anything. Mr. Burton turned to my wife and informed her that they had an automobile outside. We were not told that they would take my wife and children to the Occidental Hotel. He said to the hotel. I did not know what hotel he meant. My wife said 'No;' that she wouldn't go. At all events both she and I declined the offer, and then the men came in and moved out the stuff. It took them about an hour and a half. They didn't handle the furniture very carefully, I don't think, the way it was scratched up. They damaged it to the extent of $14.50. They carried things out separately and set them down on the ground. I cautioned them myself to use care and not to do any damage. * * *

"I do not remember that Mr. Burton on the morning of the 29th of May, the day this written notice was served, or on the preceding day, May 28th, of Mr. Burton coming where I was at the rear of the substation, or at the rear of the building that I occupied, and having a talk with me about the situation. I remember Mr. Burton being there, but it wasn't that day; it was after that, after the notice was served; it was while I was still occupying the house He did not offer me another job. He told me I could come back

if I wanted to; that he was sorry that I had gone out. In that conversation I probably told him, 'We have got just as good lawyers on our side as you have,' but I can't recall it. At that time I had probably consulted lawyers. I personally hadn't; somebody consulted a lawyer for me in regard to my rights to remain on those premises."

At the close of all the testimony counsel for defendant conceded the plaintiff was entitled to a verdict for $14.50, and moved for a directed verdict in that amount. Under the direction of the court the jury rendered a verdict in favor of plaintiff for that amount. The plaintiff brings the case here by writ of error.

Counsel claim they had a right to go to the jury upon the question of whether excessive force was used, and also upon the question of damages because of mortification, humiliation, and injured feeling, caused by having his household effects put into the street in the presence of onlookers. The record is barren of proof of forcible entry or of the exercise of excessive force. It also shows that most of the onlookers were strikers or sympathizers with the strikers and the plaintiff.

The relation of landlord and tenant between the parties did not exist. It was the relation of employer and employed; the plaintiff being in possession of property belonging to the employer by virtue of his employment. When the plaintiff voluntarily severed the relationship which entitled him to the use of the property, that moment he ended his right to its use. Suppose a maid servant was employed at a monthly wage of $20 and the use of a furnished room in the house of her employer, and should then go on a strike and refuse to do any work, could she still insist upon the right to use the furnished room? A statement of the proposition shows its unreasonableness, and yet it is like the instant case in principle.

The language used in *Bowman* v. *Bradley*, 151 Pa. 351 (24 Atl. 1062, 17 L. R. A. 213), is pertinent here:

"If the possession of the house be regarded as an incident of the hiring, the incident must fall with the principal. If it be regarded as part of the compensation for labor stipulated for, then the right to the compensation ceased when the labor was discontinued.

"Bowman had the same right to insist on the payment of the cash part of his wages as on that part which provided his family a place to live. His right under the contract of hiring was like that of the porter to the possession of the porter's lodge; like that of the coachman to his apartments over the stable; like that of the teacher to the rooms he or she may have occupied in the school buildings; like that of the domestic servants to the rooms in which they lodge in the house of their employers. In all these cases and others that might be enumerated the occupancy of the room or house is incidental to the employment. The employee has no distinct right of possession, for his possession is that of the employer, and it cannot survive the hiring to which it is incidental, or under which it is part of the contract price for the services performed. * * * When his contract ended, his rights in the premises were extinguished, and it was his duty to give way to his successor. * * * The case seems to have been begun, and tried, by the plaintiff on the theory that his right to the possession of the house was superior to his right to remain in the defendant's service. * * * When the labor ceased on the 19th of July, the plaintiff ceased to pay for his occupancy. By ceasing to labor without remonstrance or objection he must be held to acquiesce in the defendant's right to terminate the contract for labor. If that contract was rightfully terminated, then the plaintiff's right to the house was at an end, and he could be lawfully put out of possession. * * * It is not necessary that occupation of a house, or apartments, should be a necessary incident to the service to be performed in order that the right to continue in possession should end with the service. It is enough if such occupation is convenient for the purposes of the service and was obtained by reason of the contract of hiring."

To the same effect is *Heffelfinger* v. *Fulton*, 25 Ind. App. 33 (56 N. E. 688), and *Trustees* v. *Froislie*, 37 Minn. 447 (35 N. W. 260).

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.