# CHARLESTON.

Watt Angel v. Black Band Consolidated Coal Co.

Submitted March 11, 1924. Decided March 18, 1924.

1. Landlord and Tenant.—*"Estate at Will" Defined.*

   An estate at will in lands is that which a tenant has by an entry made thereon under a demise to hold during the joint wills of the parties. (p. 53).

2. Same.—*Right to Occupy Premises Leased to Miner by Coal Company Held to Cease When Services Terminated.*

   A coal mining company owns a number of dwelling houses for the use of those employed in and about its mines; they

form a part of its plant and are necessary to the successful
conduct of its business. They are rented to its miners at a
nominal charge, hardly sufficient to cover repairs and insur-
ance. The rent or charge is calculated at so much per month,
but it is paid every two weeks by deductions from the miners'
wages as they are earned. Miners are not required to live
in the houses and those who do not are paid the same wages
as those who do, all being paid at so much per ton. The
houses are not kept for rent generally, but are occupied only
by the company's employees, and then only by its consent.
Under these conditions a miner is employed, is furnished
a house, he moves in, continues his employment for a num-
ber of years, and the deductions for rent are regularly made
from his wages every two weeks; he then voluntarily quits
work and pays no rent thereafter. There being no agreement
that he should occupy the house for any definite period, when
he ceased work for the company his right to occupy the house
also ceased. (p. 55).

3.   SAME.—*Relationships Between Miner and Employer as Land-*
     *lord and Tenant and Employer and Employee Held Not*
     *Necessarily Inconsistent.*

     The miner was an employee in respect to his mining coal,
     but a tenant as respects his occupancy of the house, the two
     relations of employer and employee and landlord and tenant
     not being necessarily inconsistent with each other. (p. 56).

4.   SAME.—*Tenant Held Tenant at Will.*

     The contract being terminable at the will of either party,
     the miner had only an estate at will in the house and oc-
     cupied it as a tenant at will. (p. 56).

5.   SAME.—*Landlord May Re-enter and Remove Goods of Tenant*
     *at Will Without Legal Process, Where it Was Done Without*
     *Violence or Breach of the Peace.*

     Where he held over for a period of six months or more
     after he quit work, it may be inferred that his holding over
     was with the landlord's consent, thus creating a new tenancy
     at will; and upon refusing to vacate and remove his goods
     from the premises after notice to do so, he thereafter became
     a trespasser and his landlord had a right to re-enter and
     remove his goods, without legal process, where it was done
     without violence or breach of the peace. (p. 56).

6.   SAME—*Landlord Held Not Liable for Damages to Removed*
     *Goods.*

     Where the company removed his goods to the open, covered
     them with tarpaulins, and they remained there for four days

and nights, without any care of them on the part of the owner although he was present and knew their condition, the company is not liable for damage done thereto by frosts.  (p. 56).

7.  INSUFFICIENCY OF EVIDENCE.

A verdict which clearly has not sufficient evidence to support it should be set aside.  (p. 56).

Error to Circuit Court, Kanawha County.

Action by Watt Angel against the Black Band Consolidated Coal Company.  Judgment for plaintiff, and defendant brings error.

*Reversed and Remanded.*

*S. B. Avis,* for plaintiff in error.

*Stewart & Whitt* and *J. Howard Hundley,* for defendant in error.

MEREDITH, PRESIDENT:

Plaintiff recovered judgment for $300 in an action of trespass on the case for damages alleged to have been done by the company's employees in evicting plaintiff and removing his house-hold goods and effects from one of its houses.  Defendant assigns error.

Defendant operates a coal mining plant at Olcott, Kanawha County.  It owns and maintains there about ninety dwelling houses for the exclusive use of its employees.  It does not rent them to nor permit them to be occupied by any one who is not an employee of the company.  But its employees are not compelled to live in its houses to secure employment in its mines.  At the time of the injury complained of the company employed about 155 men, about half of which number lived in company houses, and the remainder lived in homes of their own or homes rented from persons other than the defendant.  It is claimed by the defendant that it is absolutely necessary that it own these houses in order to enable it to carry on its business; this is probably true, its mining operations could probably not be carried on without them.

The plaintiff is a coal miner, and had been employed by the company for about six years and had lived in the house

from which he was ejected about three years. He was employed at mining coal, for which he received so much per ton. He received the same rate per ton that was paid those miners who mined coal there but who did not live in the company houses; so that the rate of pay per ton in no wise depended upon whether the miner did or did not live in a company house. At the time plaintiff was employed, he was furnished a house by defendant, and for its use there was deducted from his wages as they were earned $3.00 every two weeks; there was also deducted at the same time 50 cents for electric current for lighting purposes. The houses were not owned and maintained by the company to be rented at a profit; the cost of repairs and insurance exceeded the deductions from the wages of those who occupied them.

On March 15, 1922, plaintiff voluntarily quit work and about April 1st with a number of other employees went on strike and refused thereafter to work for the company upon the terms offered. From the time he quit work no more wages accrued; thereafter he neither paid nor offered to pay rent, though he continued to occupy the house until he was evicted on October 26, 1922, a period of more than six months. Defendant notified plaintiff on October 1st to vacate; it contends that he then agreed to do so, but this is denied by him, though he admits that he received such notice. On October 20th defendant gave him a written notice to vacate on or before October 26th, stating that the company wished "to take possession on that date"; refusing to vacate, on the 26th the defendant evicted him, placing his house-hold goods out in the open about fifty feet distant from the dwelling house, where it covered them with tarpaulins, and placed a guard over them. They remained there four days until plaintiff found a place of storage. Plaintiff claims that his property was damaged by improper handling and by the night frosts.

There are but two main questions arising on the record: (1) the character of the relation between the company and the plaintiff, that is, whether it was that of landlord and tenant, and if so for what period, or employer and employee; and (2) whether the verdict is excessive.

Plaintiff claims he was a tenant from month to month, and

therefore was entitled to a month's notice of the termination of his tenancy before he could be lawfully evicted; it is conceded that no such notice was given. On the other hand, the defendant claims that plaintiff was only an employee, both as respects his services as a miner and also as respects his occupancy of the house; that when he ceased work on March 15th, his right to occupy the house ceased, he became a trespasser and could be lawfully evicted by the company without legal process. There is no proof of any special contract of lease between plaintiff and defendant. He was employed to work, was assigned a house, moved in, and the deductions from his wages were made as heretofore stated. Other houses of the company were furnished at higher rates, because they were better or larger. While the plaintiff says his lease was from month to month, that is a mere legal conclusion and we must look to the facts to determine the nature of the tenancy, if it be a tenancy. The houses were built by the company solely for the use of its employees at its mines. They form a material and necessary part of its plant and equipment. When those who lived in company houses went on strike, the company had to rent other houses for other miners who were engaged to mine coal; hence its counsel urges that the plaintiff's occupancy of its house was subsidiary and necessary to its service; or if not necessary, it was incidental or convenient to the service or so connected therewith as to render his occupancy that of a mere employee or servant, and not that of a tenant. A great number of authorities are cited for this proposition.

For example, in *Lane* v. *Au Sable Electric Co.*, 181 Mich. 26, 147 N. W. 546, Ann, Cas. 1916-C, 1108, plaintiff was employed to operate a station house at a monthly wage, and was furnished as part of his compensation a dwelling house valued at from $5.00 to $10.00 per month; he quit work, whereupon the company removed his furniture. In an action for the eviction the court held that plaintiff was an employee and not a tenant; that when he quit work his right to occupy the house ceased. The opinion quotes with approval from *Bowman* v. *Bradley,* 151 Pa. St. 351, 24 Atl. 1062, 17 L. R. A. 213: "It is not necessary that the occupation of a house or apartments

should be a necessary incident to the service to be performed in order that the right to continue in possession should end with the service. *It is enough if such occupation is convenient for the purposes of the service and was obtained by reason of the contract of hiring.* (Italics ours).

Another well considered case and one which illustrates the importance of correctly determining the relation of the parties is that of *Kerrains* v. *People,* 60 N. Y. 221, 19 Am. Rep. 158. Kerrains was convicted of assault with a deadly weapon with intent to kill. He had been employed in operating a paper mill and was paid a daily wage, and furnished a house and garden. They disagreed, his employer discharged him, paid him up, and told him to vacate the house or he would employ force and throw his goods out. Kerrains refused to leave and the employer, with two men, began removing the goods. Kerrains was then absent, but his wife sent for him, and returning, he saw what was going on, went to the wood shed, got an axe, went to the house and ordered the men out. The employer, Son, refused and drew his pistol; an altercation ensued, during which Kerrains hit Son with the axe, inflicting a serious injury. His indictment followed. The important question was "what was the character of the holding under the contract. If that was a tenancy, then the party holding over would be a tenant at will, and the landlord would not be justified in entering with strong hand"; but if defendant's occupancy was that of a servant only, then a tenancy at will or at sufferance did not spring up immediately upon the termination of his service, but to have that effect, the holding over must be sufficiently long to warrant an inference of consent to a different holding; that under the facts shown, the original relation was that of employer and emloyee, and the defendant having held over but a few days after his discharge, his holding was not converted from that of servant to tenant. If he was a mere servant, and the court held he was, the employer had the right of possession and the right to remove the defendant with his effects and to use the force necessary to accomplish that purpose.

In *People* v. *Annis,* 45 Barb. (N. Y.) 304, where the defendant was hired by the relator Hubbard to work one year

on his farm, for the sum of $270.00, and was to furnish him house room for himself and family, a garden, and pasture for a cow, it was held that this was not a demise in the nature of a lease, creating the relation of landlord and tenant, but that of employer and employee, the house, garden and pasture being a portion of the consideration for the service. There is a multitude of cases to the same effect, among them: *Mead* v. *Owen,* 80 Vt. 273, 67 Atl. 722, 12 L. R. A. (N. S.) 655, 13 Ann. Cas. 231; *Davis* v. *Long,* 45 N. D. 581, 178 N. W. 936, 14 A. L. R. 796; *Davis* v. *Williams,* 130 Ala. 530, 30 So. 488, 54 L. R. A. 749; *MacKenzie* v. *Minis,* 132 Ga. 323, 63 S. E. 900; *State* v. *Hoover,* 107 N. C. 795, 12 S. E. 451; *Chatard* v. *O'Donavan,* 80 Ind. 20, 41 Am. Rep. 782.

In all the foregoing cases there was no reservation of rent, no actual payment of rent by that name; the occupant merely performed service for its use; no rent account or charge was kept. This is a material circumstance to be considered, and has an important bearing in the present case.

There is another class of cases where the employee was furnished a house and deduction from his wages was made for its use. In *Eichengreen* v. *Appel,* 44 Ill. App. 19, Appel was employed at $10.00 per week by Eichengreen, a wholesale milk dealer; he was furnished certain "down-stairs" rooms in the employer's house, and one dollar per week was to be deducted from his wages for the rent. He was not hired for any special period nor was there any agreement that he was to occupy the rooms for any definite time. He moved in, worked five months, and quit work. During this period his employer deducted four dollars a month from his wages for rent. After Appel quit work, Eichengreen hired another man to take his place and told Appel to vacate; upon his refusal to do so, he carried his goods to a ware-house. Appel sued for damages for dispossession and for injury to his goods. It was held that when Appel quit the service he became a mere tenant a sufferance and might be put out on reasonable notice, no unnecessary force being used.

In *McGee* v. *Gibson,* 1 B. Mon. (Ky.) 105, a farmer employed a laborer for a year, at a certain price per month, agreeing to furnish him a house for which he was to pay two

dollars per month and to keep his cow at one dollar per month, both sums to be paid monthly. The laborer quit work before the end of the year, and the farmer evicted him. It was held that there was no independent lease for a year or any other period, but that his right of occupancy was incident to his contract of hire and ceased when he quit work; that from that time he was in no better position than a mere tenant at will, who by his own act terminated his tenancy, and at most, was entitled only to a reasonable time to remove his goods.

In *Graniteville Mfg. Co.* v. *Renew,* 113 S. C. 171, 102 S. E. 18, Renew was a worker in a cotton mill. According to the custom common in the mills in that state, he was furnished a company house and was paid wages, from which deductions were made for his rent. The company discharged him, paid him his wages, less the rent due, and notified him to vacate the house he occupied within three days. This he declined to do. The company sued for possession. Renew defended on the ground that he was not a tenant at all, but merely an occupier of the house as an incident to his employment; but that to dispossess him he should have had ten days' notice instead of three. There were two statutes relating to dispossession in force in that state, one requiring ten days' notice to tenants at will, domestic servants and common laborers, §3508 Civil Code, 1912, and the other providing that ''In all cases where tenants hold over after the expiration of their lease or contract for rent, whether the same be in writing or by parol, or shall fail to pay the rent when the same shall be due, the landlord is hereby authorized . . . to demand possession thereof, and in case of refusal or resistance . . . to apply to a magistrate, whose duty it shall be to have a notice served upon the person or persons so refusing to be dispossessed to show cause, before him, if any he can, within three days from the date of said personal service of such notice, why he should not be dispossessed'', §3509, Civil Code. The court held he was not a tenant at will, and not therefore to be dispossessed under the statute requiring ten days' notice; but that he was a tenant holding over after the expiration of his lease, which expired when he quit work, and therefore the

three day statute, quoted above in part, applied; that if he was merely an incidental occupier of the house, he could be dispossessed under the statute, or summarily without notice, the employer using such force as might be necessary to put him out. In our view he was a tenant at will.

Counsel for plaintiff relies upon the English case of *Smith* v. *Overseers of Seghill*, 10 Q. B. 422, which he claims is very like the instant case. There Smith was a coal miner, employed by the Seghill Colliery to mine coal at so much per ton. The Colliery had 340 houses which it kept for its workmen. Sometimes there were more workmen than houses, but whether a miner lived in a colliery house or not, he received the same rate per ton, just as in the present case. If there were not sufficient houses for the married men, the colliery gave them an allowance to assist them in paying their rent elsewhere. If a house became vacant, the colliery could call upon a married miner to occupy it, and if he refused, his allowance for rent ceased. The single miners got no allowance for rent. Smith with his family occupied one of the colliery's houses. It was conceded that he had no right to notice to vacate and that his right to occupy the house ceased when he quit work. His right to occupy the house was only incidentally involved in the particular case; the question was whether he was a tenant or a mere employee. It arose under the Poor Rate Assessment Act, (32 & 33 Vict. c. 41) which provided that: ''The overseers in making out the poor rate, shall in every case, whether the rate is collected from the owner or occupier, or the owner is liable to the payment of the rate instead of the occupier, enter in the occupier's column of the rate-book, the name of the occupier of every rateable hereditament, and such occupier shall be deemed to be duly rated for any qualification or franchise as aforesaid.'' Smith sought to compel the overseers to enter his name in the rate-book, probably for the purpose of enabling him to vote, though the reason is not mentioned in the opinion. The colliery contended that he was a mere employee; he contended that he was a tenant. The court held that he was a tenant at will so long as he resided in the house under the arrangement between him and the colliery owners, and

was entitled to have his name entered in the rate-book under the statute.

Applying the principles announced in these cases to the facts in the present case, where do the parties stand? It is conceded that plaintiff was not employed for any definite time nor did he enter defendant's house for any definite term. We think that from the nature of the agreement between them it was necessarily implied that when he ceased to work his right to occupy the house ceased also. He made no offer to pay rent after he quit work, but, according to his own testimony, claimed the right to occupy the house without payment of rent or performing work for the company—a position that could not be properly maintained for a moment. Whatever his right to the dwelling was, he was not the legal owner. Now if he was a mere employee, then his possession was not in law his own, but that of his employer; and he could not, if an employee only, bring anyone into the house to live with him, such as a lodger or roomer, without his employer's consent; if he did, the employer-owner might eject the lodger, because he would be a trespasser. *Tipsword* v. *Potter*, 31 Idaho 509, 174 Pac. 133. But in this case the parties treated the deductions from plaintiff's wages as rent. Both call it by that name and so long as the plaintiff worked for defendant, we think the circumstances show that the defendant treated the plaintiff as having an independent right to the possession, and that necessarily their relation was that of landlord and tenant. But for what term? Of wholly uncertain duration, dependent upon the will of both parties. Either party could terminate their relation at any time; therefore it was a tenancy at will. "An estate at will in lands is that which a tenant has by an entry made thereon under a demise to hold during the joint wills of the parties to the estate." 24 Cyc. 1036, and cases cited. Such was the holding of the court in the case of *Smith* v. *Overseers of Seghill, supra,* relied on by counsel for the plaintiff. Being a tenancy at will, plaintiff chose to terminate it by quitting work. His tenancy then ended. But he remained in possession from March 15th to October 1st without any demand by the company to vacate. Whether he was during this period a trespasser, a tenant at will or a ten-

ant at sufferance is unimportant. He was notified on October 1st to vacate. This demand was renewed October 20th in writing. It was his duty then to remove his family and his goods from the company's premises. Indeed, we have heretofore held that an estate at will may be terminated without notice, unless notice is required by the terms of the lease. *Hinton Foundry & Machine Co.* v. *Lilly Lumber Co.*, 73 W. Va. 477, 80 S. E. 773. If his holding over after he quit work, without objection by the company, made him a tenant at will, or by sufferance, that tenancy was terminated October 1st.

The tenancy being terminated, the company had a right to re-enter the premises and take possession, without legal process, provided it did so peaceably and without violence or breach of the peace. *Bachinsky* v. *Federal Coal & Coke Co.*, 78 W. Va. 721, 90 S. E. 227. The defendant's employees entered peaceably; they committed no violence; there was no breach of the peace; they violated no law, and plaintiff could not claim that he was unlawfully evicted because he had no legal right to possession.

The court gave the following instruction on behalf of the plaintiff:

> "The Court instructs the Jury that if you believe from the evidence in this case that at the time plaintiff's property was removed from defendant's house, the plaintiff was renting said house from the defendant from month to month, and if you further believe from the evidence that the defendant through its agents and servants and without process of law, evicted the plaintiff from the said house and removed plaintiff's household and kitchen furniture and property from said house and placed the same out in the open and in a place where it was damaged, then you are instructed that the defendant is liable for whatever damage plaintiff sustained by reason of such damage to said furniture, not to exceed the sum sued for in the declaration, and you should find for the plaintiff in whatever amount you believe has been proven by the evidence, provided you further believe from the evidence that plaintiff used due diligence to protect the said property and to reduce his loss to a minimum after he had been so evicted."

Plaintiff was not a tenant from month to month, therefore it was error to give this instruction.

Defendant's instructions numbered 2, 3, and 6 were based upon the theory that the plaintiff was an employee only and not a tenant; they were therefore properly refused.

Defendant's instruction No. 4 reads as follows:

"The Court instructs the jury that under the evidence in this case when the plaintiff refused to work for the defendant, it was his duty to leave the house and premises and remove his personal goods therefrom, and for the plaintiff to insist upon retaining possession of the house made him a trespasser, and the defendant had the right to eject him and remove his goods and property therefrom, using as much force as was necessary."

Had the defendant evicted plaintiff immediately or soon after the plaintiff quit work this would have been a proper instruction so far as that point was concerned; but he remained in the house for more than six months after he had quit work and it might be a reasonable inference that from March 15th to October 1st, when the first notice to vacate was given, he was there with defendant's consent, hence a tenant at will; he therefore would not be a trespasser until his tenancy was terminated. But after it was terminated, he became a trespasser by remaining and the defendant had a right to remove his goods. The instruction ignores this distinction, it should have been directed, not to the character of the occupancy on March 15th, when plaintiff quit work, but to the character of the occupancy when he was evicted. Had it been so modified it would have been proper on that point.

Defendant's instruction No. 6 was properly refused because it told the jury that the relation between the company and the plaintiff was not that of landlord and tenant but merely that of master and servant. We have already shown that both relations are not inconsistent, and may exist between the same parties at the same time. At the time of the eviction neither existed.

2. The only question remaining relates to the quantum of damages. The verdict was for $300.00. No attempt has been made to prove damages for the eviction, but only for injury to the goods removed. Plaintiff filed an itemized list of the

furniture owned by him, with what he claims were the approximate prices paid for each item. These aggregate more than $1000.00. He then says the property was damaged $500.00 from frosts. His wife says the damage was that much partly caused by frosts while the furniture remained out of doors, and partly by careless handling, whereby it was scratched, some of the parts got soiled on the ground, and some of her fruit jars were turned upside down and the contents lost. No witness details any particulars of loss, except the wife. She testifies to scratches on the furniture, but does not specify any piece nor go further into detail. Among the articles listed were one canned fruit and jar and one stone jar valued at $5.00 each, and groceries valued at $25.00. It may be true that the canned fruit was destroyed, but that could not have amounted to more than $5.00. All plaintiff's witnesses claim the greater part of the damage was caused by the frost. For that damage the defendant can not be held liable in this case. The record shows that defendant very carefully removed all the goods and piled them up near the railroad, about fifty feet from the house, covered them with two tarpaulins and placed a guard over them. This was done in daylight, in mid-afternoon. Plaintiff, instead of taking care of them as it was his right and duty to do, immediately left for Charleston to consult an attorney. He was looking for a lawsuit and got this one started before he attempted to find a place for his goods. Neither he nor his wife nor any one for them tried to preserve the goods while they remained out of doors during the four days and nights. They say the furniture was not wholly covered with the tarpaulins; then it was their duty to do what they could to cover it, if that would help; or they should have used more diligence to secure a place of storage. We do not think that plaintiff is entitled to any damage to his goods occasioned by the frosts; and upon the present record the proof of damage by scratches or soiling of his goods is insufficient. The evidence is wholly insufficient to sustain the amount of the verdict.

We therefore reverse the judgment, set aside the verdict, and grant a new trial.

*Reversed and remanded.*