549 S.E.2d 670

**Vera STEWART and Ron Stewart, Plaintiffs Below, Appellants,**

v.

**Dennis JOHNSON, Defendant Below, Appellee.**

No. 28462.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 2001.

Decided April 6, 2001.

Dissenting Opinion of Justice Maynard July 6, 2001.

Concurring Opinion of Justice Starcher July 11, 2001.

Nancy S. Brewer, West Virginia Legal Services Plan, Inc., Huntington, for the Appellants.

Dennis Johnson, Appellee, Pro Se, Huntington.

PER CURIAM.

Vera Stewart and Ron Stewart, appellants/plaintiffs below (hereinafter referred to as "the Stewarts"),[1] appealed the ruling by the Circuit Court of Cabell County granting judgment to Dennis Johnson, appellee/defendant below (hereinafter referred to as "Mr.

---

1. The Stewarts are husband and wife.

Johnson").[2] The Stewarts contend in this appeal that the circuit court committed error by granting judgment as a matter of law to Mr. Johnson and in denying the Stewarts' wrongful eviction claim. The Stewarts also assign error to several evidentiary rulings made by the circuit court. Based upon the parties' arguments on appeal, the record designated for appellate review, and the pertinent authorities, we reverse the decision of the Circuit Court of Cabell County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In October of 1998, the Stewarts entered into an oral rental agreement with Mr. Johnson. Pursuant to the agreement, the Stewarts were permitted to live in an apartment owned by Mr. Johnson without having to directly pay rent. In exchange, Mr. Stewart agreed to perform maintenance work on other rental properties owned by Mr. Johnson.

The landlord-tenant relationship between the Stewarts and Mr. Johnson came to an end in February, 1999. During this time period, Mr. Johnson learned that Mr. Stewart had pawned some equipment owned by Mr. Johnson. During oral argument, Mr. Stewart's counsel acknowledged that Mr. Stewart pled guilty to a misdemeanor charge involving stolen property. While this Court does not condone Mr. Stewart's conduct in unlawfully stealing the Johnsons' property, theft is not the issue before this Court. The issues before this Court relate to the Stewarts' wrongful eviction claim.

On the evening of February 4, 1999, the Stewarts returned home and found a note on their door. The note read:

I got a warrant for your arrest for selling & pawning my tools. You need to

vacate my premises no later than tomorrow.

The note bore a signature that was alleged to be that of Mr. Johnson.

The following morning, February 5, 1999, an associate of Mr. Johnson named Lou Porter came to the Stewarts' home. Thereafter, the Stewarts were told to leave the premises by noon that day. The Stewarts left their apartment to obtain a truck to move their belongings. When the Stewarts returned home, they found that all of their belongings had been removed from their apartment.

The Stewarts subsequently filed a complaint in circuit court seeking damages on the theory of wrongful eviction.[3] On March 14, 2000, a jury was empaneled to hear the case. At the conclusion of the Stewarts' case-in-chief, the trial court granted judgment as a matter of law to Mr. Johnson.[4] It is from this proceeding that the Stewarts now appeal.

## II.

## STANDARD OF REVIEW

We are asked to determine whether the circuit court committed error by granting judgment as a matter of law against the Stewarts, and whether error was committed by the trial court regarding several evidentiary rulings. The standard of review for a ruling granting judgment as a matter of law is set forth in Syllabus point 3 of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996):

The appellate standard of review for the granting of a motion for [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is *de novo*. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of [judgment as a matter

**2.** Mr. Johnson initially retained counsel, but proceeded to trial pro se. In this appeal, Mr. Johnson also proceeded pro se. Mr. Johnson did not file a brief on appeal, however, he did represent himself during oral argument before this Court.

**3.** Initially, the Stewarts filed a pro se complaint in magistrate court. Mr. Johnson filed a pro se answer to the magistrate court complaint. The Stewarts eventually retained counsel, and the

case was thereafter filed in circuit court. Mr. Johnson retained legal counsel to file an answer to the circuit court complaint. Although the circuit court proceeding involved numerous claims, in this appeal the Stewarts have only raised and briefed the wrongful eviction issue.

**4.** Mr. Johnson appeared pro se during the circuit court trial.

of law] when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting [judgment as a matter of law] will be reversed.

In this regard, we have long held that

[u]pon a motion [for judgment as a matter of law] for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence.

Syl. pt. 5, *Nichols v. Raleigh–Wyoming Coal Co.,* 112 W.Va. 85, 163 S.E. 767 (1932). *See* Syl. pt. 1, *Jividen v. Legg,* 161 W.Va. 769, 245 S.E.2d 835 (1978). Furthermore, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998).

Within these standards, we turn to the issues presented on appeal.

**5.** The general statute of frauds is found in W. Va.Code § 55–1–1 (2000) and provides as follows:

No action shall be brought in any of the following cases:

(a) To charge any person upon or by reason of a representation or assurance concerning the character, conduct, credit, ability, trade, or dealings of another, to the intent or purpose that such other may obtain thereby credit, money, or goods; or

(b) To charge any person upon a promise made, after full age, to pay a debt contracted during infancy; or upon a ratification after full age, of a promise or simple contract made during infancy; or

(c) To charge a personal representative upon a promise to answer any debt or damages out of his own estate; or

(d) To charge any person upon a promise to answer for the debt, default, or misdoings of another; or

(e) Upon any agreement made upon consideration of marriage; or

(f) Upon any agreement that is not to be performed within a year; or

(g) Upon any offer, agreement, representation, assurance, understanding, commitment, or contract of a bank, savings and loan association, or credit union, to extend credit or to make a loan in excess of fifty thousand dollars, primarily for

## III.

## DISCUSSION

### A. Judgment as a Matter of Law

■ The Stewarts presented evidence at trial to show that they had a month-to-month tenancy with Mr. Johnson and that he failed to provide to them proper notice before terminating the tenancy. Granting judgment as a matter of law, the circuit court ruled that the statute of frauds precluded the action; that the tenancy agreement between the parties was not in writing; and that it was indefinite in duration. In making these findings, the circuit court relied upon our general statute of frauds [5] and the statute of frauds concerning the sale or lease of land.[6] The trial court stated on the record:

And we have statutes that deal with real property and if there is an oral agreement regarding that's not reduced to writing, if that oral agreement can last for a year or more ... it has to be in writing[.]

\* \* \*

■ Secondly, the agreement that Mr. Stewart allegedly had with Mr. Johnson

nonagricultural, business or commercial purposes, not including charge or credit card accounts, personal lines of credit, overdrafts, or any other consumer account: Provided, That this subsection shall not apply to any offer, agreement, representation, assurance, understanding, commitment or contract with a bank, savings and loan association or credit union in which a transaction has been completed as evidenced by a fund transfer.

Unless the offer, promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent. But the consideration need not be set forth or expressed in the writing; and it may be proved (where a consideration is necessary) by other evidence.

**6.** The writing requirement for the sale or lease of land is contained in W. Va.Code § 36–1–3 (1997):

No contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby, or by his agent. But the consideration need not be set forth or expressed in the writing, and it may be proved by other evidence.

relative to working for him. There was no time specified for that and the law in West Virginia, if an agreement for personal services cannot be performed within one year it has to be reduced to writing. . . .

There was never any testimony that they intended to be there six months or nine months or anything else, so it was an oral agreement about a work situation that would exceed one year in duration.

Based upon the evidence developed at trial,[7] it was error for the trial court to hold, as a matter of law, that such evidence established a violation of the statute of frauds concerning the sale or lease of land.[8] The evidence presented by the Stewarts clearly established a prima facie case that a month-to-month tenancy existed between the parties. The statute of frauds concerning the sale or lease of land, however, does not require that month-to-month tenancy agreements be reduced to writing.[9]

▮▮▮ Where, as here, there exists a month-to-month tenancy, W. Va.Code § 37–6–5 (1997) requires a landlord provide notice equal to a full period of the tenancy.[10] *See Elkins Nat'l. Bank v. Nefflen,* 118 W.Va. 29, 188 S.E. 750 (1936) (month-to-month tenancy requires one month notice of termination). Through the testimony of the Stewarts and Mr. Johnson, it was shown that the oral tenancy agreement between the parties was indefinite in duration. We have held that the length of a tenancy indefinite in duration may be determined by the terms of the rent payment. *See Hans Watts Realty Co. v. Nash Huntington Sales Co.,* 107 W.Va. 80, 84, 147 S.E. 282, 284 (1929) ("[W]e are of opinion that the rental periods should be taken as the criterion, in the absence of other evidence of a different intention, in determining whether or not the tenancy is from year to year or month to month[.]"). The evidence presented by the Stewarts established that they paid Mr. Johnson $350 a month for rent, through work performed by Mr. Stewart for Mr. Johnson.[11] It was further shown

---

**7.** The Stewarts each testified during their case-in-chief and they called Mr. Johnson as a witness. No other witness testified.

**8.** The general statute of frauds had no application to the landlord-tenant relationship between the parties. To the extent that the general statute of frauds may have been applicable to this case, it would have concerned the employer-employee aspect of any agreement between the parties. However, that matter is not an issue presented in this appeal.

**9.** This Court has previously recognized that a person may have both an employment and a tenancy relationship with another. *See* Syl. pt. 3, *Angel v. Black Band Consol. Coal Co.,* 96 W.Va. 47, 122 S.E. 274 (1924) ("The miner was an employee in respect to his mining coal, but a tenant as respects his occupancy of the house; the two relations of employer and employee and landlord and tenant not being necessarily inconsistent with each other.").

**10.** The notice requirements of W. Va.Code § 37–6–5 (1997) provide:

A tenancy from year to year may be terminated by either party giving notice in writing to the other, at least three months prior to the end of any year, of his intention to terminate the same. A periodic tenancy, in which the period is less than one year, may be terminated by like notice, or by notice for one full period before the end of any period. When such notice is to the tenant, it may be served upon him, or upon anyone holding under him the

leased premises, or any part thereof. When it is by the tenant, it may be served upon anyone who at the time owns the premises in whole or in part, or the agent of such owner, or according to the common law. This section shall not apply where, by special agreement, some other period of notice is fixed, or no notice is to be given; nor shall notice be necessary from or to a tenant whose term is to end at a certain time. Moreover, we have held that "[a] tenant in lawful possession of premises, who is wrongfully evicted by his landlord before the expiration of his term, may maintain an action for the resulting damages. Where the wrongful eviction is malicious and wanton punitive damages may be recovered." *Cato v. Silling,* 137 W.Va. 694, 713, 73 S.E.2d 731, 743 (1952) (citations omitted).

**11.** Mrs. Stewart gave the following testimony regarding the rent payment:

Through some mutual friends my husband and I had met Mr. Johnson and he needed someone to do some work on some houses for him, so in exchange for a place to live he had told my husband you can do the work, I'll give you an apartment, and I'll pay you anything over $350.00 a month.

Mr. Stewart's testimony on the issue of rent payment indicated:

[W]e met Dennis Johnson through some mutual friends of ours. I heard about him having a lot of work done to some of his property, and at the time we needed a place to stay, a home, me and my wife. I made a verbal arrangement that I was to work for him on his mainte-

that Mr. Johnson did not provide the Stewarts with notice equal to a full period of the tenancy (one month) before evicting them.[12] To the extent that the Stewarts presented evidence showing that a month-to-month tenancy existed with Mr. Johnson, and that Mr. Johnson evicted them without providing notice equal to a full period of the tenancy, it was incumbent upon Mr. Johnson to put on evidence to refute the Stewarts' contentions. We observed in *Bluefield Supply Co. v. Frankel's Appliances, Inc.*, 149 W.Va. 622, 635, 142 S.E.2d 898, 907 (1965):

> When the plaintiff by its evidence in chief has established a prima facie case in support of its claim ... the burden of going forward with the evidence ... shifted to the defendant.... The burden of proof to establish the claim of the plaintiff, however, which unlike the burden of going forward with the evidence does not shift, rested upon the plaintiff who is required to establish its claim by a preponderance of all the evidence.

In the instant case, the trial court halted further proceedings at the close of the Stewarts' case-in-chief. This was error. Only "[w]hen the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right to recovery, [should] the trial court ... [grant judgment as a matter of law] in favor of the defendant." Syl. pt. 3, *Roberts ex rel. Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964). In this regard, "every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence." Syl. pt. 2, in part, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996) (internal quotations and citations omitted). The trial court failed to apply the above standards in

this matter. Therefore, we must reverse and remand the case for further proceedings.[13]

### B. Evidentiary Rulings

The Stewarts also challenge several evidentiary rulings made by the trial court. First, they contend the trial court improperly excluded evidence of other prior evictions by Mr. Johnson. Second, the Stewarts argue that the trial court committed error in not permitting them to impeach Mr. Johnson with written statements he made in response to the magistrate court and circuit court complaints.

**1. Evidence of prior evictions.** During the trial, Mr. Johnson stated during his opening statement that he had never unlawfully evicted anyone. The Stewarts sought to present evidence of alleged prior unlawful evictions by Mr. Johnson but the trial court ruled that such evidence was character evidence and therefore inadmissible under Rule 404(b) of the West Virginia Rules of Evidence. Rule 404(b) provides, in relevant part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith." The Stewarts argue that evidence of prior evictions by Mr. Johnson was admissible for impeachment purposes. Additionally, the Stewarts wanted to present evidence to illustrate why they were afraid of Mr. Johnson and to show a pattern of unlawful eviction as a normal business practice by Mr. Johnson.

The record indicates that the trial court failed to perform the balancing test required for Rule 404(b) evidence. In Syllabus point 2 of *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), we addressed the role of the trial court in assessing Rule 404(b) evidence:

> A. No, ma'am.

---

nance work, 350 a month. Anything over that was an hourly wage.

12. On the issue of notice, Mr. Johnson was questioned on the witness stand as follows:
Q. Now, you never gave them a 30 day notice to terminate the tenancy, did you?
A. No, ma'am.
Q. And you never evicted them through the Court?

13. We are reversing and remanding this case because the trial court committed error in granting judgment as a matter of law to Mr. Johnson. Nevertheless, we must address the remaining assignments of error because those issues may arise once again on remand.

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

*See* Syl. pt. 11, *Tudor v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997).

We will not determine in this appeal whether evidence of prior evictions by Mr. Johnson should be admitted. However, should the Stewarts again attempt to present evidence of other evictions by Mr. Johnson, the trial court must perform the balancing test required for 404(b) evidence when making its determination on the admissibility of such evidence.

**2. Impeachment through answers.** The Stewarts sought to impeach testimony by Mr. Johnson through the answers he filed in both magistrate court and circuit court. Specifically, during the trial, Mr. Johnson stated he did not send Lou Porter to the Stewarts' apartment. However, in his answer to the circuit court complaint, Mr. Johnson admitted sending Lou Porter to the apartment. Further, during the trial, Mr. Johnson testified that he did not enter and remove property from the Stewarts' apartment. In his answer to the magistrate court complaint, though, Mr. Johnson indicated he did enter the apartment and removed property therefrom. The trial court excluded Mr. Johnson's circuit court answer on the grounds that the answer was not verified. Similarly, the magistrate court answer was not admitted because Mr. Johnson was asked to read only a highlighted portion of the answer to the jury.

The basis for the trial court's ruling on both answers is not supported by law. This Court has held that "[s]ince the adoption of the Rules of Civil Procedure, there is no requirement that an answer ... be verified." Syl. pt. 2, in part, *M.W. Kellogg Co. v. Concrete Accessories Corp.*, 157 W.Va. 763, 204 S.E.2d 61 (1974). *See* W.Va. R.Civ.P. 11(a) ("Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit."). Moreover, "[w]e spoke to the question of statements made in pleadings in *Lotz v. Atamaniuk*, 172 W.Va. 116, 120, 304 S.E.2d 20, 24 (1983), terming them 'judicial admissions', and said that '[a]lthough they are not conclusive in a subsequent proceeding between the same parties, they are admissible and may be given whatever weight the trier of fact deems appropriate.'" *Moore v. Goode*, 180 W.Va. 78, 86, 375 S.E.2d 549, 557 (1988). Therefore, in the instant case the trial court erred by excluding evidence of the circuit court answer.

As to the issue of excluding the magistrate court answer because the Stewarts sought to introduce only part of it, Rule 106 of the West Virginia Rules of Evidence resolves this issue. Rule 106 provides "when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Rule 106 is applicable where a

party's utilization of a writing is "tantamount to the introduction of the [document] into evidence." *Rainey v. Beech Aircraft Corp.*, 784 F.2d 1523, 1529 n. 11 (11 Cir.1986). Therefore, reading into the record from a document would be the same as introducing that document for purposes of Rule 106.

Should the trial court believe that reading only part of the answer would somehow be misleading, then the remedy is not to exclude such evidence. The remedy is to admit into evidence any other part of the answer that would provide a more accurate statement of events. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172, 109 S.Ct. 439, 451, 102 L.Ed.2d 445, 465 (1988) ("[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rule 401 and 402." (citations omitted)). It was therefore error for the trial court to exclude evidence from the magistrate court answer.

## IV.

### CONCLUSION

For the foregoing reasons, the trial court's award of judgment as a matter of law to Mr. Johnson is reversed, and this case remanded for further proceedings consistent with this opinion.

Reversed and Remanded.

MAYNARD, Justice, dissenting.

(Filed July 6, 2001)

I dissent because I believe that the majority opinion creates a gross injustice.

At the outset, I admit that the majority, in its opinion, followed the strict confines of our landlord and tenant law. But, while the majority says that it does not condone Mr. Stewart's thievery, that is precisely the result of this decision. In West Virginia, a person can now live in a landlord's apart-

ment, pay no rent whatsoever, steal and then pawn the landlord's property without his consent, plead guilty to a misdemeanor charge involving stolen property, and then sue the landlord for damages and collect. Tolstoy was correct when he wrote "where there is law there is injustice."

Decisions like the instant one make a mockery of the justice system by rewarding blatant dishonesty and criminal misconduct while punishing a reasonable (under these circumstances) deviation from the harsh technicalities of landlord and tenant law. Mr. Stewart's suit against his landlord is simply another example of flagrant abuse. Such abuses cause people to lose confidence in the system which is a dangerous thing in a democratic society. Unfortunately, the majority validates Mr. Stewart's abuse by ensuring that his lawsuit can go forward.

Upon remand, I hope that the landlord will counterclaim for the tort of conversion or, at the least, receive an offset for any damages awarded to the Stewarts.

For the reasons stated above, I respectfully dissent.

STARCHER, Justice, concurring.

(Filed July 11, 2001)

I differ with the dissenting view set forth in Justice Maynard's separate opinion, which quotes Count Leo Tolstoy for the proposition that "where there is law there is injustice."

I suggest that the law can been seen as a tool—that, if we are fortunate, we can use, to further the ends of justice.[1]

The following summary from the record of the instant case speaks for itself, and explains why the Court's decision in the instant case is unquestionably a step toward justice.

### I.

Ron and Vera Stewart live in Huntington, West Virginia, where Ron does home improvements, general construction, and repair work. Dennis Johnson is a Huntington land-

---

**1.** As an amateur carpenter and builder, I love and understand tools. Peter, Paul, and Mary sang: "If I Had a Hammer ... I'd hammer out Justice ... I'd hammer out Freedom ... I'd hammer out Love between my brothers and sisters ... all over this land." Of course, like any tool, the law can be used for morally different purposes.

lord, with over three million dollars in rental real estate, many of the properties in a distressed state.

In October of 1998, landlord Johnson met the Stewarts, who needed a place to live. They made the following agreement:

By Ron Stewart:

A. —well, first off, we met Dennis Johnson through some mutual friends of ours. I heard about him having a lot of property, needed a lot of work done to some of his property, and at the time we need a place to stay, a home, me and my wife. I made a verbal arrangement that I was to work for him on his maintenance work, 350 a month. Anything over that was an hourly wage.

Tr. at 69–70.

Asked to describe his hours and his work for landlord Johnson, Ron Stewart replied:

A. Anywhere from 7 to 12 hours a day.

Q. And how many days a week did you work?

A. Seven days a week.

Tr. at 70.

* * *

A. I can recite most of the work, but it's hard to remember everything, so I'll try. The first restoration job was at 519 front. It needed some remodeling work done, needed new carpet. The bathroom was, of course, remodeled. New shower tub insert put in. The old claw type, I removed it, busted it out. The floor was damaged very bad. I replaced the floor in the restroom. Sheetrocked the ceiling, repainted, taped, and textured the ceilings, not just in the bathroom but the whole apartment.

Tr. at 71.

The transcript continues with three pages of description of the projects Stewart completed for Johnson. Ron Stewart stated that he was paid infrequently, but kept working because he continued to have the benefit of the housing:

Q. Did he owe you more money?

A. Yes, ma'am, I'd worked over my 350 rent.

Q. Did you ask him to pay you?

A. Yes ma'am.

Q. How many times did you ask him?

A. Three to five times. I called him personally at his home two or three times. He always assured me that he'd come by and bring me a check that he owed me for over the rent. He never showed up.

Q. He never did?

A. No ma'am.

Tr. at 73.

During the winter months in 1998–1999, Stewart admitted that, unpaid for weeks, and needing food, he improperly but temporarily pawned two tools that he was using which belonged to Johnson. One was retrieved and returned before Johnson ever knew it had been gone. Stewart did not yet have the $20.00 required for the second. Johnson learned of the incident and was enraged.

Stewart explained that his last project was the work on Johnson's own residence, completed on February 3, 1999.

A. ... Along with that I did do some remodeling work to his own home.

Q. Is that the last project you were working on?

A. Yeah, that was my very last project.

Q. And when did you finish the work in his own home?

A. February 3rd was the day I finished up his house.

Q. And that was just before you were asked to leave?

A. Yes ma'am.

On the evening of February 4, 1999, the Stewarts returned home late from playing cards with friends. On the door was the following note, signed by Johnson:

Tex                              Feb 4 1999
 I got a warrant for your arrest for selling & pawning my tools. You need to vacate my premises no later than tomorrow.

No warrant for Ron Stewart's arrest existed at that time. The Stewarts found the door open and the interior ransacked. Pawn tickets lay everywhere, some were missing, and a TV was gone.

Early the next morning Lou Porter, Johnson's associate, banged on the door, told them to move out and to be gone by after-

noon. The Stewarts had witnessed other forcible on-the-spot evictions, and were fearful. Evidence of the other evictions was excluded at trial. The Stewarts left the apartment to try to get a truck. When they returned, all of their belongings, personal effects and household furnishings, as well as their two newborn kittens and the mother cat, had been removed from the residence.

Johnson admitted at trial that as of February 4 and 5, the Stewarts were in lawful possession of the unit. Johnson also admitted he had given Stewarts no 30-day notice to vacate, had not evicted them through the court, and had not then claimed they owed rent:

Q. Now, you never gave them a 30 day notice to terminate the tenancy, did you?

A. No, Ma'am.

Q. And you never evicted them through the Court?

A. No, ma'am.

Q. So they were still in lawful possession of the apartment on February 4th and 5th?

A. On February 4th and 5th, yes, ma'am.

* * *

Q. Now, you don't have any records or documentation that you told them they owed you money? Like you never sent them a bill or anything?

A. No, ma'am.

Tr. at 124–125.

Johnson admitted in his handwritten Answer filed in Magistrate Court, and in his Answer to Plaintiffs' Amended Complaint in the circuit court, that he bagged the Stewarts' possessions, and cleaned out the unit. At trial, he changed the testimony, stating someone else removed the Stewarts' belongings. In any case, when the Stewarts returned from the search for a truck, everything was gone.

Johnson also admitted, after some equivocation, that the Stewarts had not, and he knew the Stewarts had not, abandoned the apartment:

Q. You knew on February 4 or February 5 that Ron was still working for the rent, the rent on the apartment for you?

A. Not on those dates. I'm not sure of the exact date—but as of that time he was still—

A. Before that yes.

Q. —he was a tenant?

A. Yes.

Q. He was a lawful tenant?

A. (Witness nodded in the affirmative.)

Q. Now you knew that he was still living there?

A. Yes.

* * *

Q. Yea, on February 4 he had not been gone for a long period of time, he was living there the whole time?

A. Prior to February 4, yes.

* * *

Q. All right. So as of the 4th of February, you weren't looking for him and you had no idea what—that he—would think that he would abandon the apartment—

A. No ma'am. I mean that date right there I'm sure accurate that it's on there . . .

Tr. at 129–130.

## II.

The above factual recital speaks for itself, and explains why the plaintiffs in the instant case have an absolute right to have their case decided on its merits by a jury.

The instant case is noteworthy because it is a pretty rare occasion when people who do not have a high income can take a relatively simple economic grievance to court and have a jury decide and evaluate their claim.[2] When people are on the lower rungs of the economic ladder they usually do not have the money, or time, or energy to use the legal system as a tool—to seek the simple but powerful economic and personal justice that a jury can provide.

It is therefore good to see in the instant case that a Legal Aid lawyer fought persis-

2. Personal injury cases are a different story; there are plenty of lawyers who will represent people with substantial personal injury claims, without regard to the client's income.

tently for her clients' right to have a jury speak on the issue of what justice is for these plaintiffs and this defendant.

I fully concur in the Court's opinion.