# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

### September 2014 Term

**FILED**

**September 29, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0745

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent**

**V.**

**MARCUS PATRELE MCKINLEY,**
**Defendant Below, Petitioner**

---

**Appeal from the Circuit Court of Mercer County**
**Honorable Omar J. Aboulhosn, Judge**
**Criminal Action No. 12-F-90-0A**

**AFFIRMED**

---

**Submitted:  September 17, 2014**
**Filed:  September 29, 2014**

Paul R. Cassell
Cassell & Crewe, P.C.
Wytheville, Virginia
Attorney for the Petitioner

Patrick Morrisey
Attorney General
Laura Young
Assistant Attorney General
Julie Warren
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent

**CHIEF JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      Signed opinions containing original syllabus points have the highest precedential value because the Court uses original syllabus points to announce new points of law or to change established patterns of practice by the Court.

2.      Signed opinions that do not contain original syllabus points also carry significant, instructive, precedential weight because such opinions apply settled principles of law in different factual and procedural scenarios than those addressed in original syllabus point cases.

3.      Signed opinions, both those including new syllabus points and those not containing new syllabus points, are published opinions of the Court.  As such, they should be the primary sources relied upon in the development of the common law.

4.      Memorandum decisions are decisions by the Court that are not signed, do not contain a Syllabus by the Court, and are not published.

5.      While memorandum decisions may be cited as legal authority, and are legal precedent, their value as precedent is necessarily more limited; where a conflict exists between a published opinion and a memorandum decision, the published opinion controls.

6. To the extent our prior holdings in *Walker v. Doe*, 210 W. Va. 490, 558 S.E.2d 290 (2001), are inconsistent with this Court's recognition that signed opinions will be used both in cases that articulate new points of law and in cases in which a new point of law is not required, such prior holdings are expressly overruled.

7. "Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial." Syllabus point 3, *State v. Ferguson*, 165 W. Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa*, 173 W. Va. 43, 311 S.E.2d 412 (1983).

8. "The curative admissibility rule allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has 'opened the door' by introducing similarly inadmissible evidence on the same point. Under this rule, in order to be entitled as a matter of right to present rebutting evidence on an evidentiary fact: (a) The original evidence must be inadmissible and prejudicial, (b) the rebuttal evidence must be similarly inadmissible, and (c) the rebuttal evidence must be limited to the same evidentiary fact as the original inadmissible evidence." Syllabus point 10, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

9. "In order for a lay witness to give opinion testimony pursuant to Rule

701 of the West Virginia Rules of Evidence (1) the witness must have personal knowledge or perception of the facts from which the opinion is to be derived; (2) there must be a rational connection between the opinion and the facts upon which it is based; and (3) the opinion must be helpful in understanding the testimony or determining a fact in issue." Syllabus point 2, *State v. Nichols*, 208 W. Va. 432, 541 S.E.2d 310 (1999), *modified*, *State v. McCraine*, 214 W. Va. 188, 588 S.E.2d 177 (2003).

10. "A judgment will not be reversed because of the admission of improper or irrelevant evidence when it is clear that the verdict of the jury could not have been affected thereby." Syllabus point 7, *Torrence v. Kusminsky*, 185 W. Va. 734, 408 S.E.2d 684 (1991).

11. "The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense." Syllabus point 3, *State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003).

12. "A court's ultimate discretion in accepting or rejecting a plea agreement

is whether it is consistent with the public interest in the fair administration of justice."

Syllabus point 4, *Myers v. Frazier*, 173 W. Va. 658, 319 S.E.2d 782 (1984).

**Davis, Chief Justice:**

The petitioner herein, Marcus McKinley [hereinafter "Mr. McKinley"], was convicted of first degree murder by a jury in the Circuit Court of Mercer County. The jury did not recommend mercy; consequently, the circuit court sentenced Mr. McKinley to life in prison without the possibility of parole. Here, Mr. McKinley has made the following assignments of error: (1) improper admission of prior bad act evidence, (2) admission of improper testimony from a social worker, (3) improper exclusion of testimony by a psychiatrist, (4) erroneous rejection of a plea agreement, (5) improper admission of opinion testimony by a fact witness, (6) erroneous ruling concerning Facebook evidence, and (7) the prejudicial impact of the cumulative effect of the errors. After a careful review of the briefs, the record submitted on appeal, and listening to the argument of the parties, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 2007 or early 2008, Mr. McKinley met Ayanna Patton. At the time, Ms. Patton was about fifteen years old. Mr. McKinley and Ms. Patton eventually began dating. At some point during the relationship, a child was born. The relationship between the couple was very violent. On numerous occasions, the police responded to domestic violence incidents between the couple. The volatility of the relationship caused the Department of Health and Human Resources to place the couple's child in the care of Ms. Patton's mother.

1

It appears that in May 2011, Ms. Patton had a protective order in place that prevented Mr. McKinley from having any contact with her. In spite of the protective order, on May 18, 2011, Ms. Patton met with Mr. McKinley at a McDonald's restaurant. While at the restaurant, Ms. Patton asked Mr. McKinley for money to help pay her cell phone bill. Mr. McKinley gave Ms. Patton some money for the phone bill. Ms. Patton left the restaurant and drove alone to an apartment she had rented.[1] Mr. McKinley did not know where Ms. Patton was staying. Therefore, he contacted a friend and asked for the address where Ms. Patton was living. After obtaining the address, Mr. McKinley drove to Ms. Patton's apartment.

When Mr. McKinley arrived at Ms. Patton's apartment, they had a brief argument regarding a woman Mr. McKinley knew. Mr. McKinley spent the night at the apartment. In the early morning hours of May 19, 2011, Mr. McKinley awakened and began reading text messages on Ms. Patton's cell phone. Mr. McKinley saw several text messages between Ms. Patton and another man. Mr. McKinley became upset over the contents of the text messages and retrieved a gun he carried. Mr. McKinley aimed the gun at Ms. Patton and shot her five times. Ms. Patton died at the scene.

After Mr. McKinley killed Ms. Patton, he fled the apartment and drove to

---

[1]Ms. Patton had not fully moved into the apartment. She was actually still living at her mother's home.

North Carolina. During the process of fleeing to North Carolina, Mr. McKinley used a cell phone to contact several people. He gave incriminating statements indicating that he had killed Ms. Patton. The local police were able to track Mr. McKinley to North Carolina because of signals that were given off by the cell phone he was using–which apparently belonged to Ms. Patton. When the police located Mr. McKinley in North Carolina, he gave incriminating statements indicating he killed Ms. Patton.

Mr. McKinley was brought back to West Virginia. On February 15, 2012, he was indicted for first degree murder in the death of Ms. Patton. Prior to the trial, it was learned that the prosecutor had a conflict of interest in the case. The conflict of interest involved the prosecutor's prior representation of Mr. McKinley in another criminal case. Initially, the trial court was reluctant to disqualify the prosecutor. While the conflict of interest issue was still pending before the court, the parties entered into a plea agreement in which Mr. McKinley would plead guilty to second degree murder. However, the trial court rejected the plea agreement and disqualified the prosecutor. A special prosecutor was appointed.

The case was tried before a jury as a unitary trial. That is, the defendant elected not to bifurcate the issue of guilt and mercy.[2] During the trial, the State called

---

[2]The State had filed a motion to bifurcate the trial, but Mr. McKinley opposed
(continued...)

3

twenty-seven witnesses during its case-in-chief.  Mr. McKinley called thirteen witnesses

during his case-in-chief.  Mr. McKinley also testified and admitted to shooting Ms. Patton

five times. The State called six rebuttal witnesses.  At the conclusion of all the evidence, the

jury returned a verdict convicting Mr. McKinley of first degree murder without a

recommendation of mercy.  The trial court immediately sentenced Mr. McKinley to prison

for life without a possibility of parole.  Mr. McKinley filed post-trial motions which were

denied.  This appeal followed.


## II.

## STANDARD OF REVIEW

Mr. McKinley has asserted various assignments of error that are subject to

specific standards of review that we set forth in the discussion section.  In addition to those

standards, we also note that:

> In reviewing challenges to findings and rulings made by
> a circuit court, we apply a two-pronged deferential standard of
> review.  We review the rulings of the circuit court concerning a
> new trial and its conclusion as to the existence of reversible
> error under an abuse of discretion standard, and we review the
> circuit court's underlying factual findings under a clearly
> erroneous standard.  Questions of law are subject to a *de novo*
> review.

---

[2](...continued)
the motion.  *See* Syl. pt. 4, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996) ("A trial
court has discretionary authority to bifurcate a trial and sentencing in any case where a jury
is required to make a finding as to mercy.").

Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).  Mindful of the scope of our review, we proceed to consider the errors assigned by Mr. McKinley.

## III.

## DISCUSSION

Mr. McKinley has assigned seven issues as error in this case. Our resolution of those issues does not require the creation of any new point of law. As such, this case would ordinarily be issued as a per curiam opinion. However, as discussed below, this Court will no longer issue per curiam opinions. Consequently, before we reach the merits of this appeal, we will take this opportunity to explain why per curiam opinions are not necessary in West Virginia jurisprudence.

### A. Per Curiam Opinions Are No Longer Necessary

A court of last resort speaks only through its written decisions, and it is critical to the development of the common law in this State that those decisions adhere to a well-understood pattern.  As a result of the widespread changes to the appellate process in this State that took place in 2010, the number of written decisions on the merits issued by the Court has expanded significantly.  The appeal by right process adopted by the Court has been fully implemented, and the time has come to more closely examine the usefulness of the per curiam opinion.  For the reasons that follow, we conclude that the per curiam opinion is no longer necessary.

5

**1. Scope and form of decisions.**  The scope and form of the decisions of this Court are primarily governed by the West Virginia Constitution.  Our decisions are required to address "every point fairly arising upon the record" and are "binding authority upon any court" if concurred in by a majority of the justices.  W. Va. Const. art. VIII, § 4.  With regard to the Court's decision to affirm, reverse, or modify the order of a lower tribunal, "the reasons therefor shall be concisely stated in writing and preserved with the record."  *Id.*  The Constitution also contains a unique provision that is applicable to published opinions: "it shall be the duty of the court to prepare a syllabus of the points adjudicated in each case in which an opinion is written and in which a majority of the justices thereof concurred, which shall be prefixed to the published report of the case."  *Id.*  The consequence of this provision is that the Court itself—not the reporter of decisions or the publisher—drafts the syllabus in a published opinion.  As a result, the syllabus in every published opinion is an integral part of the decision itself.  Each point in the syllabus is numbered, which facilitates ease of reference in later opinions.

Syllabus points come in two forms.  Original syllabus points announce an important new point of law decided in the case.  Quoted syllabus points repeat language used in a prior original syllabus, along with a citation to the case where the point was originally established.  The syllabus is not intended to be an exhaustive recitation of every item decided in the case, and must be read in light of the opinion as a whole.  "[T]his Court only makes the more important points of law a part of the syllabus for the general information of the legal

6

profession and the public[.]" *Koonce v. Doolittle*, 48 W. Va. 592, 594, 37 S.E. 644, 645 (1900). In an address to the circuit judges of this State in 1940, the Dean of the College of Law at West Virginia University explained the relationship between the opinion and the syllabus as follows:

> It seems clear, therefore, that the fact that the court lays down a general principle whether in the opinion or in the syllabus does not *per se* make it law; the law of a case is something more than the mere *ipse dixits* of the court; it is something whose authoritative force proceeds in part from elements more interstitial and more elusive than the general propositions which our constitution requires the court to prefix to its opinions.

*"The Law" — In West Virginia*, Thomas P. Hardman, 47 W. Va. L. Q. 23, 28 (1940).

**2. History of per curiam opinions in West Virginia.** With very rare exceptions, the published opinions issued by the Court during the first 110 years of its existence set forth the name of a single judge[3] or justice who authored the majority opinion of the Court. Such opinions are commonly referred to as "signed" or "authored" opinions. As required by the Constitution, signed opinions issued in this era contained a syllabus of points adjudicated prefixed to the published report of the case, and, in many instances, those opinions contained one or many original syllabus points. However, in contrast to modern practice, many *signed* opinions issued before the mid-1970s contained only *quoted* syllabus points. *See, e.g., State ex rel. Duke v. O'Brien*, 145 W. Va. 600, 117 S.E.2d 353 (1960)

---

[3]Prior to the Judicial Reorganization Amendment, the Justices of the Court were referred to as "Judges" and the Chief Justice was referred to as "President."

(Majority opinion authored by President Browning, citing only quoted syllabus points); *Daugherty v. Day*, 145 W. Va. 592, 116 S.E.2d 131 (1960) (Majority opinion authored by Judge Given, citing only quoted syllabus points); *Davis v. Haddox*, 145 W. Va. 233, 114 S.E.2d 463 (1960) (Majority opinion authored by Judge Given, citing only quoted syllabus points). Under this longstanding historic practice, every published opinion was a signed opinion, but not every signed opinion contained a new point of law in the syllabus.

In the mid-1970s, the Court began the regular practice of issuing unsigned opinions that did not contain the name of a justice who authored the opinion, instead denoting that the opinion was authored "per curiam," which is Latin for "by the court." Some of these early per curiam opinions contained all new syllabus points, *Committee on Legal Ethics of West Virginia State Bar v. Graziani*, 157 W. Va. 167, 200 S.E.2d 353 (1973) (Majority opinion authored per curiam, with four original syllabus points), while others did not, *Serbin v. Newman*, 157 W. Va. 71, 198 S.E.2d 140 (1973) (Majority opinion authored per curiam, with one quoted syllabus point). Although we have not conducted an exhaustive review, the practice of using per curiam opinions to announce new syllabus points continued at least until 1981. *See Priester v. Hawkins*, 168 W. Va. 569, 285 S.E.2d 396 (1981) (Majority opinion authored per curiam, with one quoted syllabus point and one new syllabus point). This practice was not routine, however. A review of the ninety per curiam opinions published in 1981 reveals that most of the per curiam opinions contained only quoted syllabus points. Eventually, the practice of the Court evolved so that per curiam opinions

8

were used only in cases where new syllabus points were *not* announced.

> At some point in time, this Court began distinguishing between its signed opinions and per curiam decisions based upon the existence of new points of law. Only those cases in which new syllabus points are written are designated as signed opinions; all others currently fall under the rubric of per curiam opinions.

*Walker v. Doe*, 210 W. Va. 490, 494, 558 S.E.2d 290, 293 (2001).

For a period of time in the 1990s, the binding authority of per curiam opinions was called into question as a consequence of footnote four in *Lieving v. Hadley*, 188 W. Va. 197, 423 S.E.2d 600 (1992), which stated:

> It is important to point out this Court's traditional approach to *per curiam* opinions. *Per curiam* opinions, such as *Rowan* [*v. McKnight*, 403 S.E.2d 780, 184 W.Va. 763 (1991)], are used to decide only the specific case before the Court; everything in a *per curiam* opinion beyond the syllabus point is merely *obiter dicta.* A *per curiam* opinion that appears to deviate from generally accepted rules of law is not binding on the circuit courts, and should be relied upon only with great caution. Other courts, such as many of the United States Circuit Courts of Appeals, have gone to non-published (not-to-be-cited) opinions to deal with similar cases. We do not have such a specific practice, but instead use published *per curiam* opinions. However, if rules of law or accepted ways of doing things are to be changed, then this Court will do so in a signed opinion, not a *per curiam* opinion.

*Id.* at 201 n.4, 423 S.E.2d at 604 n.4. As a result of this announcement—paradoxically issued by footnote rather than by syllabus point—some in the legal community took the view that a per curiam opinion could not be cited as precedent. This view was probably bolstered by the fact that, for a period of time after *Lieving* was issued, this Court's own per curiam

9

opinions routinely contained a cross-reference to the cautionary footnote. *See, e.g., Pritt v. Suzuki Motor Co., Ltd.*, 204 W. Va. 388, 390 n.1, 513 S.E.2d 161, 163 n.1 (1998) ("We point out that a per curiam opinion is not legal precedent."). This routine admonition was problematic for three reasons. First, it overstated the *Lieving* footnote. Second, it created an unnecessary and disruptive point of dispute in the legal community about whether a per curiam opinion could be cited in support of a legal argument. Third, it ignored the constitutional provision which states that the decisions of this Court are "binding authority upon any court" if concurred in by a majority of the justices. W. Va. Const. art VIII, § 4.

The era of the *Lieving* footnote was relatively short-lived. Nine years later, the Court issued its decision in *Walker v. Doe*, which "aim[ed] to extinguish any lingering doubts regarding the precedential value of [per curiam] opinions." *Id.*, 210 W. Va. at 493, 558 S.E.2d at 293. We held that "we strongly disagree" with the suggestion that anything beyond the syllabus in a per curiam opinion was merely *obiter dicta*, because adhering to that view "would be discarding many valuable cases in which the presence of unique facts has required this Court to determine whether settled legal precepts applied to those distinct factual scenarios." *Id.*, 201 W. Va. at 495, 558 S.E.2d at 295. Ultimately, Syllabus points 2, 3, and 4 of *Walker* summarized the precedential import of signed and per curiam opinions in a manner that cleared away the confusion created by the *Lieving* footnote:

> 2. This Court will use signed opinions when new points of law are announced and those points will be articulated through syllabus points as required by our state constitution.

10

3. Per curiam opinions have precedential value as an application of settled principles of law to facts necessarily differing from those at issue in signed opinions. The value of a per curiam opinion arises in part from the guidance such decisions can provide to the lower courts regarding the proper application of the syllabus points of law relied upon to reach decisions in those cases.

4. A per curiam opinion may be cited as support for a legal argument.

*Walker v. Doe*, 210 W. Va. 490, 558 S.E.2d 290.

**3. Memorandum Decisions.** In 2010, this Court finalized extensive amendments to the Rules of Appellate Procedure in order to provide that every properly perfected appeal would result in a written decision on the merits. This historic switch from appeals by permission to appeals by right greatly expanded the number of written decisions issued by the Court. In addition to the traditional signed opinions and per curiam opinions, the revised rules created a third method to dispose of cases on the merits: the memorandum decision. As explained in the comments to the revisions, "[m]emorandum decisions are abbreviated decisions on the merits that will not contain a syllabus and will not be published in the West Virginia Reports." W. Va. Revised R. App. P. 21 cmt. at 56 (Dec. 1, 2010).[4] Both by operation of Rule 21 and by evidence of the thousands of decisions issued since 2010, there is no question that memorandum decisions are pronouncements on the merits that

---

[4]The revised rules with comments are available online at http://www.courtswv.gov/legal-community/court-rules/appellate-procedure/pdfs/Revised-Rules-of-Appellate-Procedure-FINAL.pdf.

11

fully comply with the constitutional requirements to address every point fairly arising upon the record and to state the reasons for a decision concisely in writing. It is equally clear that memorandum decisions occupy a lower station on the scale of precedent when compared to published opinions.

Memorandum decisions are used to affirm the decision of a lower court in three circumstances:

> when: (1) this Court finds no substantial question of law and the Court does not disagree with the decision of the lower tribunal as to the question of law; (2) upon consideration of the applicable standard of review and the record presented, the Court finds no prejudicial error; or (3) other just cause exists for summary affirmance.

W. Va. R. App. P. 21(c). In parity with the applicable constitutional language, the rule requires "a concise statement of the reason for affirmance." *Id.* Additionally, a memorandum decision must set forth "a concise statement of the reason for issuing a memorandum decision instead of an opinion." *Id.* Rule 21(d) applies similar requirements to memorandum decisions that reverse a lower tribunal's decision, and adds an additional restriction: "[a] memorandum decision reversing the decision of a circuit court should be issued in limited circumstances." The rule makes it plain that memorandum decisions can be cited to a court, although the citation "must clearly denote that a memorandum decision is being cited." W. Va. R. App. P. 21(e). That same rule also makes clear that memorandum decisions are not published in the official reporter, but are made available on the Court's

12

website.

On balance, Rule 21 and the evidence of the Court's practice since the rule was promulgated show that memorandum decisions are distinguishable from opinions in that they address cases in which there is no substantial question of law or no prejudicial error, and are almost always used to affirm a lower court's decision. These factors—when combined with the fact that the decisions are summary in nature, do not contain a syllabus, and are not published in the official reporter—make clear that a memorandum decision has less persuasive force as a legal precedent than a published opinion.[5]

Obviously, at the time *Walker v. Doe* was decided, this Court was still operating under the appeal by permission system, and memorandum decisions did not exist. That reality has changed, and memorandum decisions have substantially enlarged the availability of decisions that apply well-settled principles of law to various factual scenarios. In light of this new reality, and in light of the fact that the no-new-syllabus point per curiam is a relatively recent invention, the question becomes whether the published per curiam opinion is still necessary.

---

[5]Upon review of this question, we pause to correct a misleading statement in the comment to Rule 21 that refers to the parties' ability "to request a non-precedential disposition early in the development of the case." W. Va. Revised R. App. P. 21 cmt. at 56 (Dec. 1, 2010). Memorandum decisions are indeed legal precedent, though of lesser weight than a published opinion. The statement in the comment would have been better phrased as "a non-*published* disposition early in the development of the case."

13

**4. Criticism of per curiam opinions.** At least one legal commentator has criticized the use of per curiam opinions as "a misused practice that is at odds with the individualized nature of the American common law system, frustrating efforts to hold individual judges accountable and inhibiting development of the law." Ira P. Robbins, *Hiding Behind the Cloak of Invisibility: The Supreme Court and Per Curiam Opinions,* 86 Tul. L. Rev. 1197, 1199 (2012). Because published opinions are the main work of an appellate jurist, attributed opinions and publicly recorded votes are the main way to hold appellate justices accountable. *Id.* at 1210. Unsigned opinions frustrate that accountability because opinions "issued per curiam may harm the courts' credibility if the public believes it is a tactic used for strategic or political reasons or to maintain secrecy." *Id.* at 1213. In the absence of an individually responsible author, the reasoning of a per curiam opinion "may be disjointed and incoherent." *Id.* at 1214. This tendency may lead to opinions of lower quality, and may "diminish consequences for judges who fail to do enough of their own work." *Id.* at 1216. The commentator asserts that these concerns apply with particular force in a jurisdiction such as West Virginia, where judges are elected. *Id.* at 1221-23.

Similar criticisms have been leveled by members of this Court from time to time. For example, shortly after the decision in *Walker v. Doe*, Justice Albright filed a separate opinion that included statements from an earlier dissenting opinion by Justice Workman about the misuse of per curiam opinions:

> I concur with the result articulated by the majority

opinion. I write separately to address a disturbing trend in the manner in which this Court periodically chooses to present new points of law. While the majority opinion correctly decides the substantive legal matter, its pronouncements are framed within the context of a per curiam opinion and no new syllabus points were presented to formalize the ruling. As Justice Workman astutely observed in her dissent to *State v. Lopez*, 197 W. Va. 556, 476 S.E.2d 227 (1996),

> This case portrays the increasing use of per curiam opinions to alter the law as it currently exists in West Virginia while declining to enunciate the change in a new syllabus point. It illustrates an evolving problem that this Court should correct. Although this is not the first example of this phenomenon, it is the one least justified. In the past some good reason has existed. It has occurred where there has been a "compromise" decision. It has occurred when the membership of the Court has been in a state of flux, with all the accompanying philosophical shifting, and a "temporary" court had the good judgment to recognize that it was not the time to make major policy changes in the law. None of those phenomenon [sic] are present here.

*Id*. at 569, 476 S.E.2d at 240 (Workman, [J.,] dissenting).

*Butcher v. Miller*, 212 W. Va. 13, 20, 569 S.E.2d 89, 96 (2002) (Albright, J., concurring).

In addition to these assertions, the practice of using a per curiam opinion to announce a decision that also contains concurring or dissenting opinions further undermines judicial accountability. If indeed an opinion is authored "by the Court," there should very rarely, if ever, be a need for separate opinions.

15

Although we acknowledge these criticisms, our decision today is not grounded entirely upon them. We wish to underscore that our decision today is based more forcefully on the fact that per curiam opinions are a relatively recent phenomenon whose existence has been rendered unnecessary by the substantial expansion of merits decisions under the new appellate process.

**5. A system of precedent.** In recognition of the foregoing authorities, we adopt a three-tier system of precedent intended to clarify the weight of opinions issued by this Court. Henceforth all published opinions of this Court will bear the name of an individual justice who authored the opinion of the Court. To provide guidance as to the weight to be afforded the various types of opinions, we hold that signed opinions containing original syllabus points have the highest precedential value because the Court uses original syllabus points to announce new points of law or to change established patterns of practice by the Court. Additionally, we hold that signed opinions that do not contain original syllabus points also carry significant, instructive, precedential weight because such opinions apply settled principles of law in different factual and procedural scenarios than those addressed in original syllabus point cases. We further hold that signed opinions, both those including new syllabus points and those not containing new syllabus points, are published opinions of the Court. As such, they should be the primary sources relied upon in the development of the common law. Moreover, we hold that memorandum decisions are decisions by the Court that are not signed, do not contain a Syllabus by the Court, and are not published. Finally, we

hold that, while memorandum decisions may be cited as legal authority, and are legal precedent, their value as precedent is necessarily more limited; where a conflict exists between a published opinion and a memorandum decision, the published opinion controls. Conflicts between memorandum decisions and published opinions should be used by the legal community as a basis to urge this Court to consider, address, and resolve such conflict. Lastly, we hold that, to the extent our prior holdings in *Walker v. Doe*, 210 W. Va. 490, 558 S.E.2d 290 (2001), are inconsistent with this Court's recognition that signed opinions will be used both in cases that articulate new points of law and in cases in which a new point of law is not required, such prior holdings are expressly overruled.

## *B. Admission of Prior Bad Act Evidence*

The first issue raised by Mr. McKinley involves the trial court's pretrial ruling that permitted the State to introduce evidence of two incidents of prior domestic violence between him and Ms. Patton. Mr. McKinley's brief has also set out a general argument regarding other bad acts evidence that was introduced during the trial.

The procedure for admitting evidence of other bad acts by a defendant is found under Rule 404(b) of the West Virginia Rules of Evidence.[6] The standard of review of a

---

[6]We note that Rule 404 was amended in 2014, with an effective date of September 2, 2014. All references to provisions of Rule 404 in this opinion will be based upon the rule as it existed during the prosecution in this case. No material change was made
(continued...)

17

circuit court's decision regarding the admissibility of Rule 404(b) evidence has been stated

as follows:

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. LaRock*, 196 W. Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996).

We held in Syllabus point 2 of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d

516 (1994), that when there is an offer of Rule 404(b) evidence, the trial court must hold an

in camera hearing to evaluate that evidence:

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b).

---

[6](...continued)
in the 2014 amendment with respect to the specific provisions of Rule 404 that are
considered in this opinion.

> If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

We have also made clear that "[i]f a trial court has admitted 'bad character' evidence in error, a petitioner is only entitled to reversal if the error affected his substantial rights." *State v. Rollins*, ___ W. Va. ___, ___, 760 S.E.2d 529, 546 (2014).

With the above standards in mind, we first address the trial court's decision to allow the State to present evidence of two specific domestic violence incidents. We will thereafter address Mr. McKinley's general argument involving the introduction of other bad acts evidence at the trial.

**1. Admission of two specific incidents of domestic violence.** Prior to trial, the State filed a motion to allow the introduction of evidence involving two domestic violence incidents between Mr. McKinley and Ms. Patton. One incident occurred on March 11, 2011, approximately two months before Ms. Patton was killed. The State presented testimony from a police officer who investigated the incident. It occurred at a local motel. According to the officer, Mr. McKinley stated that he stopped Ms. Patton from committing

19

suicide. However, Ms. Patton stated that she did not try to commit suicide and that Mr. McKinley choked her. The officer observed red marks on her neck. The State also presented evidence from a video of a domestic violence proceeding in which Ms. Patton stated that Mr. McKinley became violent with her and choked her at the motel.

The second domestic violence incident occurred on April 12, 2011, about a month before Ms. Patton was killed. The State called a police officer who had responded to the incident. The officer testified that Ms. Patton's clothes were dirty and that she had scratches on her body. According to the officer, Ms. Patton stated that Mr. McKinley pushed her down a hill. Mr. McKinley admitted to the officer that he pushed Ms. Patton; but, he stated that he acted in self defense.

The State made two arguments to the trial court as to why both domestic violence incidents were admissible. First, the State contended that this evidence was intrinsic to the murder, and, therefore, it was outside the scope of Rule 404(b). Second, the State argued that even if the two incidents were deemed extrinsic to the murder, the evidence was admissible under Rule 404(b) to show motive and intent. We will separately examine the issues of intrinsic and extrinsic evidence.

*(i) Intrinsic evidence.* The trial court ruled that both domestic violence incidents were intrinsic to the murder. Therefore, Rule 404(b) was not applicable. Our cases have "consistently held that evidence which is 'intrinsic' to the indicted charge is not governed by Rule 404(b)." *State v. Harris*, 230 W. Va. 717, 722, 742 S.E.2d 133, 138 (2013). In *LaRock,* we noted that other bad acts "evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were necessary preliminaries to the crime charged." *LaRock,* 196 W. Va. at 312 n.29, 470 S.E.2d at 631 n.29 (internal quotations and citation omitted). In Syllabus point 3 of *State v. Ferguson,* 165 W. Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa*, 173 W. Va. 43, 311 S.E.2d 412 (1983), we held:

> Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial.

The State relies upon *State v. Dennis*, 216 W. Va. 331, 607 S.E.2d 437 (2004), as authority for admitting the two domestic violence incidents as intrinsic evidence. The defendant in *Dennis* was convicted of kidnaping, second degree robbery, two counts of second degree sexual assault, violating a domestic violence protective order, and domestic battery. One of the issues raised on appeal involved the admission of domestic violence the defendant had inflicted upon the victim three months before the current charges. This Court

21

found that the evidence was admissible as intrinsic evidence. The opinion addressed the

issue as follows:

> These incidents were used to demonstrate Appellant's pattern of abusive and controlling behavior as a means of defining the turbulent nature of the relationship the victim had with Appellant after she attempted to break off the relationship with Appellant. . . . After carefully reviewing the record, we cannot say that the trial court abused its discretion in finding that the prior acts constituted intrinsic evidence, not subject to Rule 404(b) analysis. While the acts were not part of a "single criminal episode" or "necessary preliminaries" to the charged offenses, it is difficult to conclude that the evidence was not necessary "to complete the story of the crimes on trial" or otherwise provide context to the crimes charged. This is especially true in light of the domestic violence overlay to the pattern of behavior. Even if we were to conclude that the trial court erred in finding the prior act evidence to be res gestae, we believe the evidence would still be admissible under Rule 404(b). The incidents from Appellant's recent past would have satisfied a number of acceptable purposes set forth in Rule 404(b), including proving motive, opportunity and knowledge. In either case, it seems doubtful that this case could have been appropriately presented without such background information. Finding that the lower court did not act in an arbitrary or irrational manner or otherwise abuse its discretion, we find no error.

*Dennis*, 216 W. Va. at 352, 607 S.E.2d at 458.


Mr. McKinley contends that *Dennis* is distinguishable because one of the

crimes against the defendant in that case was domestic battery.[7] We do not find that fact to

---

[7]Mr. McKinley cites, without discussion, to the decision in *State v. Bowling*, 232 W. Va. 529, 753 S.E.2d 27 (2013), as authority for holding that the domestic violence
(continued...)

be sufficient to remove the application of *Dennis* to this case.

Although the two domestic violence incidents in this case were not a "single criminal episode," we believe this evidence was necessary to place Ms. Patton's death in context with her relationship with Mr. McKinley, and to complete the story of the violence Mr. McKinley inflicted on her.[8] The basis for our finding this evidence to be intrinsic was also applied in *LaRock*, where we addressed the issue of evidence of prior beatings inflicted

---

[7](...continued)
evidence was too remote in time to be intrinsic. *Bowling* does not stand for the proposition that other bad acts conduct which occurred two months before the charged offense is too remote to be intrinsic evidence. In *Bowling,* we concluded that the abuse of the murder victim by the defendant "which occurred more than *six months* before the 2010 shooting, is [not] linked together in point of time and circumstances with the crime charged herein." *Bowling*, 232 W. Va. at 549, 753 S.E.2d at 47 (emphasis added). *But see State v. Winebarger*, 217 W. Va. 117, 617 S.E.2d 467 (2005) (holding that other bad acts evidence that occurred five to fifteen years prior to the crime charged was admissible to demonstrate defendant's intent and the absence of accident or mistake).

[8]Other bad acts evidence is intrinsic if it:

(1) arises out of the same criminal episode or series of transactions as the charged offense; (2) *is necessary for the jury to understand the context of the crime or completes the story of the charged offense*; (3) identifies who committed the crime or why the charged offense was committed; or (4) explains the nature of the relationship between the individuals who committed the crime or explains why an individual may have knowledge of the charged offense.

Thomas M. DiBiagio, "Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to A Fair Trial," 47 Syracuse L. Rev. 1229, 1241-42 (1997) (emphasis added).

on a victim before the victim was killed:

> Evidence of the prior attacks and beatings not only demonstrated the motive and setup of the crime but also was necessary to place the child's death in context and to complete the story of the charged crime. We hold that historical evidence of uncharged prior acts which is inextricably intertwined with the charged crime is admissible[.]

*LaRock*, 196 W. Va. at 313, 470 S.E.2d at 632. *See State v. Hutchinson*, 215 W. Va. 313, 321, 599 S.E.2d 736, 744 (2004) ("We find that the evidence which the appellant challenges on this appeal was merely presented as context evidence illustrating why the appellant committed this murder. It portrayed to the jurors the complete story of the inextricably linked events of the day and amounted to intrinsic evidence.").

*(ii) Extrinsic evidence.* Even if we had found that the two domestic violence incidents were not intrinsic evidence, we would find the evidence admissible as extrinsic evidence under Rule 404(b). Extrinsic bad act evidence is governed by Rule 404(b) because it "is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." *Harris*, 230 W. Va. at 722, 742 S.E.2d at 138 (internal quotations and citation omitted). The State argued below, as an alternative ground, that the domestic violence evidence was admissible under Rule 404(b) to show motive and intent. We agree.

To begin, we find that, based upon the testimony of the witnesses at the Rule 404(b) hearing, the State established by a preponderance of the evidence that the two

incidents of domestic violence occurred and that Mr. McKinley committed the acts. We also find that this evidence was relevant to show motive and intent. It has been recognized that, "[w]hile proof of motive is not a required element in criminal cases, it is always relevant and admissible to prove that the accused committed the offense." Franklin D. Cleckley, Louis J. Palmer, Jr., and Robin Jean Davis, Vol. 1, Handbook on Evidence for West Virginia Lawyers, § 404.03[2][e][iv] (2012). Moreover, in order to show intent, "[i]t is a universally established rule that in prosecutions for murder it is competent for the state to introduce in evidence threats, or statements in the nature of threats, by the defendant against the life of the deceased." *State v. Berry*, 176 W. Va. 291, 293, 342 S.E.2d 259, 261 (1986) (internal quotations and citations omitted). Finally, we believe that the probative value of evidence of the two domestic violence incidents outweighed the danger of unfair prejudice. *See People v. Escobar*, 98 Cal. Rptr. 2d 696, 82 Cal. App. 4th 1085 (2000) (admitting evidence of prior domestic violence incident in first degree murder prosecution).

**2. The admission of other bad acts evidence.** The next issue raised by Mr. McKinley is that, in addition to the two domestic violence issues the trial court permitted the State to introduce, the State also introduced other domestic violence incidents. The State argues that it was permitted to introduce evidence of additional domestic violence incidents because Mr. McKinley called five witnesses during his case-in-chief who provided evidence of alleged domestic violence by Ms. Patton against him. In other words, the State argues that any error caused by its introduction of additional incidents of domestic violence was invited

25

error.

Although the State has briefed the additional incidents of domestic violence under the invited error doctrine,[9] we believe the curative admissibility rule is the more appropriate doctrine for evaluating this issue.[10] *See Longwell v. Hodge*, 171 W. Va. 45, 47, 297 S.E.2d 820, 822 (1982) ("We agree with the Circuit Court, and affirm its decision, although for different reasons than those expressed by the lower court.").

"[T]he curative admissibility rule comes into play when irrelevant evidence is

---

[9]We set out the parameters of the invited error doctrine in *State v. Crabtree*, 198 W. Va. 620, 482 S.E.2d 605 (1996), as follows:

> "Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is not to make the evidence admissible but to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences.

*Crabtree*, 198 W. Va. at 627, 482 S.E.2d at 612.

[10]"The doctrine of curative admissibility . . . is sometimes considered to be a form of 'invited error.'" *Bruno's Supermarkets, Inc. v. Massey*, 914 So. 2d 862, 868 (Ala. Civ. App. 2005). However, the curative admissibility rule places "more emphasis on the inadmissibility of the complaining party's evidence." *Taylor v. State*, 858 P.2d 843, 848 (Nev. 1993).

introduced without objection and the opponent seeks to introduce rebuttal evidence that is

also irrelevant." Cleckley et al., Handbook on Evidence, § 106.02[2]. This Court set out the

guidelines for the use of the curative admissibility rule in *State v. Guthrie*, 194 W. Va. 657,

461 S.E.2d 163 (1995):

> The curative admissibility rule allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has "opened the door" by introducing similarly inadmissible evidence on the same point. Under this rule, in order to be entitled as a matter of right to present rebutting evidence on an evidentiary fact: (a) The original evidence must be inadmissible and prejudicial, (b) the rebuttal evidence must be similarly inadmissible, and (c) the rebuttal evidence must be limited to the same evidentiary fact as the original inadmissible evidence.

Syl. pt. 10, *Guthrie, id.*[11]

---

[11]Dicta in a footnote in *State v. Potter*, 197 W. Va. 734, 748 n.24, 478 S.E.2d 742, 756 n.24 (1996), incorrectly suggested "it is questionable whether curative admissibility is available to the State." However, the curative admissibility rule may be invoked by the State. *See*, *e.g.*, *Howard v. United States*, 978 A.2d 1202, 1210 (D.C. 2009) ("[T]he doctrine of curative admissibility . . . provides that in certain circumstances the prosecution may inquire into evidence otherwise inadmissible, but only after the defense has 'opened the door' with regard to this evidence." (internal quotations and citation omitted))*; State v. Weaver*, 912 S.W.2d 499, 516 (Mo. 1995) ("Under the doctrine of curative admissibility, the prosecutor was entitled to delve into the defendant's arrests, introducing otherwise inadmissible evidence to counteract the negative inferences."); *State v. Tollardo*, 275 P.3d 110, 116-17 (N.M. 2012) ("When a defendant makes a claim that 'opens the door' to inadmissible evidence, the doctrine of curative admissibility in some circumstances may permit the State to rebut that claim with otherwise inadmissible evidence."); *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) ("[W]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissable evidence in order to explain or counteract a negative inference raised by the issue defendant injects." (internal quotations and citation omitted)).

As previously indicated, the trial court allowed the State to introduce evidence of only two domestic violence incidents. As a result of the trial court's ruling admitting such evidence, Mr. McKinley informed the court that he was going to introduce other evidence of domestic violence that Ms. Patton had inflicted upon him. Mr. McKinley took the position that insofar as he believed the trial court committed error in allowing the State to introduce evidence of two domestic violence incidents, the door was open for him to introduce additional evidence of domestic violence.

We disagree with Mr. McKinley's position. As we have already determined, the trial court properly allowed the State to introduce two incidents of domestic violence. This evidence was admissible as being intrinsic, and was also admissible to show Mr. McKinley's motive and intent. However, even if the admission of this evidence was erroneous, this did not permit Mr. McKinley to parade five witnesses before the jury to talk about alleged domestic violence perpetrated against him by Ms. Patton.

In fact, the evidence introduced by Mr. McKinley suggesting Ms. Patton had a violent character was not permitted because this evidence was irrelevant. The test for the admissibility of character evidence of the victim under Rule 404(a)(2) of the West Virginia Rules of Evidence is as follows:

> [U]nder Rule 404(a)(2) it is not required that the defendant rely upon self-defense in order to offer character evidence of the victim. The test for admissibility is solely one of relevance.

28

> That is, is the character evidence probative of an element of the charge or defense?  If it is, despite the absence of self-defense the character evidence is admissible.

Cleckley et al., Handbook on Evidence, § 404.02[5][b][I].

In this case, the issue of whether Ms. Patton was a violent or aggressive person simply had no relevancy to an element of the charge or defense.  The evidence in this case, as testified to by Mr. McKinley, revealed that he woke up and read text messages on Ms. Patton's cell phone.  The contents of the text messages apparently angered Mr. McKinley, and he shot Ms. Patton five times.  Nothing in Mr. McKinley's own description of the murder revealed any aggressive behavior by Ms. Patton toward him.  Under these circumstances, Mr. McKinley had no basis to introduce evidence of alleged domestic violence by Ms. Patton against him.  *See* Syl. pt. 1, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971) ("When in a prosecution for murder the defendant relies upon self-defense to excuse the homicide and the evidence does not show or tend to show that the defendant was acting in self-defense when he shot and killed the deceased, the defendant will not be permitted to prove that the deceased was of dangerous, violent and quarrelsome character or reputation.").

The decision in *State v. Gray*, 217 W. Va. 591, 619 S.E.2d 104 (2005), illustrates the relevancy requirement of Rule 404(a)(2).  In *Gray*, the defendant was convicted of first degree murder.  On appeal, one of the issues he raised was that the trial court committed error in not allowing him to introduce evidence of the victim's bad

personality. We rejected the argument as follows:

> Considering the facts of this case, . . . the evidence concerning the victim's general reputation was not relevant as admissible evidence. The appellant did not assert self-defense or allude to any possibility that the victim was aggressive in any manner. Instead, he claimed that the shooting was accidental. He even said he and the victim had a good relationship and that just prior to the shooting, the victim was sitting on his lap and the two of them were kissing. Likewise, the appellant has not cited any legal authority for the admissibility of evidence concerning the "bad personality" of the victim in a murder case when his defense was that this was an accidental shooting.

*Gray*, 217 W. Va. at 600, 619 S.E.2d at 133.

Insofar as Mr. McKinley improperly presented evidence of domestic violence by Ms. Patton against him, the State could rebut such evidence by introducing evidence of other domestic violence perpetrated by Mr. McKinley against Ms. Patton.[12] Indeed, it has been observed that, under

> Rule 404(a)(2), the prosecution is permitted to rebut evidence offered by the accused. . . .
>
> . . . This rebuttal evidence is not limited in its use to lessening the impact of the original character evidence but may be offered to prove the opposite character and that the accused acted in

---

[12]The State also pointed out that, in addition to testifying, Mr. McKinley also called witnesses to testify about his good character in general and his reputation for truthfulness. Once a defendant puts on evidence of his character, "it may be 'tested' on cross-examination by the prosecution and rebutted during the prosecution's case in rebuttal." Cleckley et al., Handbook on Evidence, § 404.02[3][d]. Consequently, the State was allowed to present additional bad acts evidence, through cross-examination and rebuttal, that contradicted evidence of Mr. McKinley's good character and reputation for truthfulness.

conformity therewith on this occasion.

Cleckley et al., Handbook on Evidence, § 404.02[5][b][iv].[13]

### C. Admission of Improper Testimony from a Social Worker

The second assignment of error by Mr. McKinley involves testimony by a licensed social worker named Sandra Dorsey. The record indicates that, beginning in February 2011, Ms. Dorsey provided domestic violence services to Ms. Patton. Ms. Dorsey was called as a witness during the State's case-in-chief and rebuttal. Mr. McKinley's assignment of error involving Ms. Dorsey's testimony is written in a very rambling and incoherent manner. In an attempt to try to discern the precise issue Mr. McKinley is attempting to make, we will examine this assignment of error in two parts: (1) improper bad acts and state of mind evidence and (2) opinion evidence.

---

[13]Mr. McKinley has also made an undeveloped argument under this assignment of error, alleging that "evidence from various witnesses concerning the victim's state of mind that the defendant was going to kill her, should never been allowed." Because this issue was not adequately briefed, we deem the matter waived. *See State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority . . . are not considered[.]").

**1. Improper bad acts and state of mind evidence.** Mr. McKinley has cited to the following areas of testimony by Ms. Dorsey as being improper: (1) Ms. Patton stated that Mr. McKinley put a gun to her head and threatened to kill her, (2) Ms. Patton stated that Mr. McKinley stabbed her, and (3) Ms. Patton stated she was afraid Mr. McKinley was going to kill her. The sum total of Mr. McKinley's argument regarding this evidence is as follows: "[T]his evidence should have been excluded as improper other bad act evidence or irrelevant state of mind evidence concerning the decedent's state of mind." Nothing else was argued or set out regarding this issue. "To the extent Mr. [McKinley] intended this fleeting comment to be an assignment of error, it is inadequate for review." *State v. Robert Scott R., Jr.*, 233 W. Va. 12, __ n.40, 754 S.E.2d 588, 602 n.40 (2014). *See State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) ("[A]ppellate courts frequently refuse to address issues that appellants, or in this case the appellee, fail to develop in their brief."). We have long held that "[a]ssignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived." Syl. pt. 6, *Addair v. Bryant*, 168 W. Va. 306, 284 S.E.2d 374 (1981). *See State, Dep't of Health & Human Res., Child Advocate Office v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) ("[A] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim[.]" (internal quotations and citations omitted)).

**2. Lay opinion evidence.** The next issue asserted under this assignment of error involves lay opinion testimony. The lay opinion testimony involved the admission of a letter that was written by Ms. Dorsey. Mr. McKinley argues that the letter contained improper lay opinion testimony and should have been excluded.[14]

To begin, "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." Syl. pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983). With respect to the issue of lay opinion testimony, we have held:

> In order for a lay witness to give opinion testimony pursuant to Rule 701 of the West Virginia Rules of Evidence (1) the witness must have personal knowledge or perception of the facts from which the opinion is to be derived; (2) there must be a rational connection between the opinion and the facts upon which it is based; and (3) the opinion must be helpful in understanding the testimony or determining a fact in issue.

Syl. pt. 2, *State v. Nichols*, 208 W. Va. 432, 541 S.E.2d 310 (1999), *modified, State v. McCraine*, 214 W. Va. 188, 588 S.E.2d 177 (2003).

The State concedes that the letter in question "does contain Ms. Dorsey's personal opinion[.]" However, the State takes the position that Mr. McKinley opened the

_____

[14]Mr. McKinley also contends that, while she was on the witness stand, Ms. Dorsey improperly "testified about the decedent's alleged state of mind in believing that the defendant was going to kill her." This issue was not developed beyond the statement itself. It is therefore waived.

door for the letter's introduction. Therefore, the State argues that it was admissible under Rule 106 of the West Virginia Rules of Evidence and the curative admissibility rule.[15]

We have set out the standard for the curative admissibility rule in the previous section and will therefore not repeat that standard here. *See Guthrie*, 194 W. Va. at 682, 461 S.E.2d at 188 ("[T]his rule is a restatement of the general rule that when a party opens up a subject, there can be no objection if the opposing party introduces evidence on the same subject.").

Rule 106 provides "when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." We have noted that "Rule 106 is applicable where a party's utilization of a writing is tantamount to the introduction of the [document] into evidence." *Stewart v. Johnson*, 209 W. Va. 476, 483-84, 549 S.E.2d 670, 677-78 (2001). Moreover, the rule is "based upon the common law 'rule of completeness,' [and] is designed to reduce the risk that a writing or recording will be taken out of context or that an initial misleading impression will influence the minds of the jurors." *State v. Gray*, 204 W. Va. 248, 250-51,

---

[15]Rule 106 was amended in 2014, with an effective date of September 2, 2014. All references to provisions of Rule 106 in this opinion will be based upon the rule as it existed during the prosecution in this case. The amendment to Rule 106 was merely stylistic and no substantive change was made.

511 S.E.2d 873, 875-76 (1998) (internal quotations and citation omitted).

In the instant case, the record indicates that Ms. Dorsey had written a letter to the county prosecutor complaining about a previous arrest of Ms. Patton, which arose out of a domestic dispute with Mr. McKinley.[16]  Apparently, the trial court had ruled that the letter was not admissible.[17]  However, during cross-examination of Ms. Dorsey, counsel for Mr. McKinley raised the issue of the letter as follows:

> Q.  Okay.  And you, by a letter to Mr. Ash, the prosecuting attorney of Mercer County, you basically complained that the fact that you didn't feel it was right that both of them [Ms. Patton and Mr. McKinley] got arrested in that incident over the car seat.
>
> A.  No, Sir, I did not.
>
> Q.  Okay.  What was the memo that you sent him that he replied to?
>
> [Prosecutor]:  Judge, I have a copy, if the Court wants me to furnish it. She said she didn't bring anything with her.
>
> The Court: You have a copy of what?
>
> [Prosecutor]: The letter. I'd be more than happy to give her a copy of the letter and let her read it, if that's what [defense counsel] wants.

Counsel for Mr. McKinley did not question Ms. Dorsey any further regarding the letter she

---

[16]It appears that Mr. McKinley was also arrested at the same time.

[17]The record suggests that there was more than one letter that was not admissible.  However, only one of the letters was admitted.

wrote to the prosecutor.

During redirect examination of Ms. Dorsey, the State informed the court that it was going to introduce the entire contents of the letter to the jury because defense counsel opened the door for its admission. In ruling that the letter could be introduced into evidence, the trial court gave the following reasons:

> I think you opened up the door, Mr. Czarnik [defense counsel]. I mean, you asked questions about these letters. He didn't ask anything about these letters, as I recall. They weren't coming in at all until you asked questions about them. You opened up the door, and you take things out of it, then he's got to put them back in context.

Assuming, without deciding, that Rule 106 and the curative admissibility rule would have allowed some contents of the letter to be read to the jury, we find that neither rule permitted the letter to be introduced in its entirety. After reviewing the contents of the letter written by Ms. Dorsey, we believe the contents of the letter went far beyond the scope of the two questions Mr. McKinley's counsel asked. The letter discussed issues that simply had nothing to do with the issue of Ms. Dorsey complaining about Ms. Patton's arrest. Both Rule 106 and the curative admissibility rule limit the scope of evidence introduced under them to that which is necessary to place in context the improperly admitted evidence.[18] *See Gray*,

---

[18]It should be noted that the Comment to new Rule 106 makes specific reference to limiting the use of evidence presented under it. The Comment states:

(continued...)

204 W. Va. at 254 n.8, 511 S.E.2d at 879 n.8 ("Rule 106 does not require introduction of the entire document, but rather only that portion of the remainder of the document which explains or clarifies the previously admitted portion."). *See also People v. Manning*, 695 N.E.2d 423, 433-34 (Ill. 1998) ("[T]he doctrine of curative admissibility is not a panacea; it does not permit a party to introduce inadmissible evidence merely because the opponent brought out some evidence on the same subject. The rule is merely protective and goes only as far as is necessary to shield a party from adverse inferences."). Therefore, we find that the trial court abused its discretion by allowing the State to read the entire letter to the jury.

Even though we find that the lower court abused its discretion in the admission of the letter in its entirety, prejudice must be demonstrated to reverse the conviction based upon the erroneous admission of the evidence. In Syllabus point 7 of *Torrence v. Kusminsky*, 185 W. Va. 734, 408 S.E.2d 684 (1991), we explained that "[a] judgment will not be reversed because of the admission of improper or irrelevant evidence when it is clear that the verdict of the jury could not have been affected thereby." Justice Cleckley noted in *Guthrie* that,

---

[18](...continued)
The trial court should limit the introduction, by an adverse party, of any other part of a writing or recorded statement to information that is relevant or assists the jury in placing the writing or recorded statement in context. *The adverse party does not have the absolute right to place the entire writing or recorded statement in evidence*.

W. Va. Revised R. Evid. 106 cmt. (Sept. 2, 2014) (emphasis added).

when dealing with the wrongful admission of evidence, we have stated that the appropriate test for harmlessness articulated by this Court is whether we can say with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence was independently sufficient to support the verdict and the jury was not substantially swayed by the error.

*Guthrie*, 194 W. Va. at 684, 461 S.E.2d at 190.  Moreover, in *State v. Blake*, 197 W. Va. 700, 705, 478 S.E.2d 550, 555 (1996), this Court explained that,

[e]ven when a trial court has abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error. In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question."  Instead, this Court will only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury.

(Citations omitted).  With respect to harmless error, this Court has articulated the following test:

Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. pt. 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979).

38

We have no hesitancy in finding that the admission of the letter was harmless beyond a reasonable doubt. The issue of Mr. McKinley's guilt in killing Ms. Patton was never contested. Mr. McKinley took the witness stand and admitted that he shot Ms. Patton five times. In addition, there was sufficient circumstantial evidence for the jury to find that the State proved all of the elements of first degree murder. Finally, we do not find that the letter was unduly prejudicial because much of its focus on the conduct of Mr. McKinley was properly admitted into evidence through other witnesses.

### D. Exclusion of Testimony by a Psychiatrist

The next issue raised by Mr. McKinley involves the trial court's determination that he could not call his psychiatric expert to offer an opinion that, at the time of the murder, he suffered from an "extreme emotional disturbance." Mr. McKinley's brief points out that he "was attempting to offer a diminished capacity defense based on the extreme emotional disturbance suffered by [him] at the time of the shooting." The State contends that the psychiatrist's diagnosis of extreme emotional disturbance was insufficient to meet the standard required to support a diminished capacity defense.

When considering the propriety of a circuit court's decision to exclude the testimony of an expert witness, we examine the decision for an abuse of discretion. As we stated in Syllabus point 6 of *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991):

39

The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.

The standard for establishing the diminished capacity defense was set out in

Syllabus point 3 of *State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003), as follows:

> The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.

*See State v. Ferguson*, 222 W. Va. 73, 662 S.E.2d 515 (2008).

In the instant case, the trial court determined that, under the decision in *Joseph*,

the diminished capacity defense could only be established by evidence of a mental defect or

disease. The trial court excluded testimony by Mr. McKinley's expert because the expert

"opined that the Defendant did not suffer from either a mental defect or disease at the time

of the offense." The record supports this finding by the circuit court.

Mr. McKinley's expert, Dr. Bobby Miller, testified at a pretrial hearing that,

at the time of shooting, Mr. McKinley did not have a psychiatric diagnosis, *i.e.*, mental defect

or disease.  Dr. Miller stated:

> I agree with the prosecutor that at the time of the offense he had no psychiatric diagnosis, and I would go so far to say that when I saw him, his major depression was not an impediment either to criminal responsibility or to competence to stand trial.

Dr. Miller went on to provide a description of extreme emotional disturbance as follows:

> Extreme emotional disturbance is described as instances for which there is a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in a defendant's situation under the circumstances that the defendant believed that to be.
>
> . . . .
>
> It is not a defense, per se, as much as it is an explanation to the finder of fact to address why the incident happened, and to help the finder of fact to assess culpability

Dr. Miller also testified that Mr. McKinley had the requisite intent and malice to shoot Ms Patton, but because of extreme emotional disturbance he may not have been able to premeditate:

> Within my report, it's my opinion that Mr. McKinley did have intent to kill, meaning that he knew the outcome of his actions or what would happen when he pulled the trigger.
>
> I also find that he had malice. I believe he had malice because of the relationship that he had with the victim, as well as the context, which I'll go through briefly in a second.
>
> What perhaps is debatable is whether or not it was time for deliberation and therefore, whether or not there was cognitive and emotional capacity for premeditation at that moment, if in fact the defense of extreme emotional distress is allowed.

41

The issue raised by Dr. Miller's testimony is whether extreme emotional disturbance can support the defense of diminished capacity. This issue was addressed by the court in *Commonwealth v. Spotz*, 47 A.3d 63 (Pa. 2012). The defendant in *Spotz* was convicted of first degree murder and sentenced to die. His conviction and sentence were affirmed on direct appeal. Thereafter, the defendant filed a habeas corpus petition alleging, among other things, that he had ineffective assistance of counsel because his counsel failed to prepare a diminished capacity defense, which forced him to proceed pro se at his trial. The appellate court determined that the only evidence of the defendant's mental state at the time of the murder was a medical opinion that he had an extreme mental or emotional disturbance. The appellate court summarily rejected extreme mental or emotional disturbance as a basis for establishing the diminished capacity defense:

> An "extreme mental or emotional disturbance" does not in any factual or legal sense equate to an inability to formulate intent, and thus cannot support the advancement of a diminished capacity defense.

*Spotz*, 47 A.3d at 94.

We agree with the decision in *Spotz*. A finding of extreme emotional disturbance simply is not sufficient to establish the defense of diminished capacity. In fact, the legal concept of extreme emotional disturbance is itself recognized by a few jurisdictions as a stand alone affirmative defense. *See State v. Wang*, 92 A.3d 220, 226 (Conn. 2014) ("[T]he state requested that the defendant provide notice of a defense of mental disease or

42

defect, or extreme emotional disturbance."); *State v. Adviento*, 319 P.3d 1131, 1145 (Haw. 2014) ("[Extreme mental or emotional disturbance] is an affirmative defense to murder or attempted murder, which reduces the offense to manslaughter or attempted manslaughter if the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.")*; Jackson v. Commonwealth*, No. 2012-CA-002062-MR, 2014 WL 2631277, at *1 (Ky. Ct. App. June 13, 2014) ("We conclude that Jackson's arguments regarding defense counsel's failure to present any witnesses or evidence supporting the defense theory of extreme emotional disturbance is dispositive of this matter, requiring reversal and remand."); *People v. Nunez*, 991 N.Y.S.2d 121, 124 (2014) ("Where, as here, a defendant raises the affirmative defense of extreme emotional disturbance to mitigate a charge of attempted murder, he or she may be convicted of attempted manslaughter in the first degree if the jury accepts that defense."); *State v. Below*, 264 Or. App. 384, 386, ___ P.3d ___, ___ (2014) ("Defendant's case proceeded to a bench trial, where his defense was that he killed the victim as a result of an extreme emotional disturbance. *See* ORS 163.135 (providing for extreme emotional disturbance defense to murder).").

It is quite clear that the affirmative defense of extreme emotional disturbance does not require a showing of a mental disease or defect.[19] The distinction between the two

---

[19]The defense of extreme emotional disturbance has been defined in this
(continued...)

defenses of extreme emotional disturbance and diminished capacity has been summarized

as follows:

> Note that "extreme mental and emotional disturbance" is similar to the controversial diminished capacity doctrine. The Model Penal Code, however, distinguishes the doctrines by commenting that [extreme emotional disturbance] has an objective component in requiring that there exist a "reasonable explanation or excuse" for the extreme emotional disturbance. Diminished capacity, by contrast, relies upon an entirely subjective standard, thereby allowing a mental disorder to reduce a crime to a lesser offense regardless of the reasonableness of the perpetrators [sic] emotional disturbance which provoked the homicide.

Janet Ford, "Susan Smith and Other Homicidal Mothers – In Search of the Punishment That

Fits the Crime," 3 Cardozo Women's L.J. 521, 532 n.90 (1996) (internal quotations and

citations omitted).

---

[19](...continued)

manner:

> Extreme emotional disturbance may reasonably be defined as follows: Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986).

In light of the above, the circuit court did not abuse its discretion in precluding Mr. McKinley's expert from presenting evidence of an extreme emotional disturbance to establish the defense of diminished capacity.

### E. Rejection of a Plea Agreement

The next issue raised by Mr. McKinley is that the trial court committed error in rejecting a plea agreement the State made with him. The State takes the position that the trial court has discretion to reject a plea agreement and properly exercised that discretion.

We have held that "West Virginia Rules of Criminal Procedure, Rule 11, gives a trial court discretion to refuse a plea bargain." Syl. pt. 5, *State v. Guthrie*, 173 W. Va. 290, 315 S.E.2d 397 (1984). *See* Syl. pt. 2, *State ex rel. Brewer v. Starcher*, 195 W. Va. 185, 465 S.E.2d 185 (1995) ("There is no absolute right under either the West Virginia or the United States Constitutions to plea bargain. Therefore, a circuit court does not have to accept every constitutionally valid guilty plea merely because a defendant wishes so to plead."). It has also been held that "[a] court's ultimate discretion in accepting or rejecting a plea agreement is whether it is consistent with the public interest in the fair administration of justice." Syl. pt. 4, *Myers v. Frazier*, 173 W. Va. 658, 319 S.E.2d 782 (1984). In offering direction on this point, we have held as follows:

> As to what is meant by a plea bargain being in the public interest in the fair administration of justice, there is the initial consideration that the plea bargain must be found to have been

voluntarily and intelligently entered into by the defendant and that there is a factual basis for his guilty plea. Rule 11(d) and (f). In addition to these factors, which enure to the defendant's benefit, we believe that consideration must be given not only to the general public's perception that crimes should be prosecuted, but to the interests of the victim as well.

Syl. pt. 5, *Myers*, 173 W. Va. 658, 319 S.E.2d 782. Finally, we have said that

[a] primary test to determine whether a plea bargain should be accepted or rejected is in light of the entire criminal event and given the defendant's prior criminal record whether the plea bargain enables the court to dispose of the case in a manner commensurate with the seriousness of the criminal charges and the character and background of the defendant.

Syl. pt. 6, *Myers*, *id*. Based upon our review of the record on this issue, we find no error in the circuit court's refusal to accept Mr. McKinley's plea agreement.

The record in this case indicates that the circuit court was hesitant to disqualify the prosecutor because of a possible conflict of interest. During the period that the disqualification issue was pending, the prosecutor and defendant entered into a plea agreement. The agreement required Mr. McKinley to plead guilty to second degree murder. There appears to have been a conference call by the parties with the trial court about the plea; however, that discussion was not recorded. Subsequent to the conference call, the trial court stated on the record the reasons for his rejection of the plea and entered an order rejecting the plea. The trial court indicated in the order that the plea was being rejected because it was only made as a result of the court's initial reluctance to disqualify the prosecutor, the victim's family was opposed to the plea, and the plea was not in the interest of the public.

46

Although we are concerned that the record does not disclose the discussion that occurred at the conference call, we believe the circuit court articulated sufficient grounds in its order for rejecting the plea. Therefore we find no merit to this assignment of error.

### F. Admission of Opinion Testimony by a Fact Witness

The next issue raised by Mr. McKinley concerns testimony by one of the investigating officers in the case, Trooper J.M. Ellison. Mr. McKinley argues that Trooper Ellison "testified to blood splatter evidence and to his opinion as to where the gun was or where the shooter was at the time based upon the shell casings [sic] final positioning." Mr. McKinley contends that this evidence should have been excluded because Trooper Ellison "was not qualified as an expert." We disagree.

To the extent that Trooper Ellison's testimony could be considered an opinion, it was properly admitted as a lay opinion under Rule 701 of the West Virginia Rules of Evidence.[20] Opinion testimony by lay witnesses is permitted under the rule. We have held

---

[20]Rule 701 was amended in 2014. The amendment was mostly stylistic, but one new provision was added. The version of the rule in place when Mr. McKinley was prosecuted, and which is relied upon here, stated the following:

> If the witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of

(continued...)

that

> [t]he determination of whether a witness has sufficient knowledge of the material in question so as to be qualified to give his opinion is largely within the discretion of the trial court, and will not ordinarily be disturbed on appeal unless clearly erroneous.

Syl. pt. 4, *Cox v. Galigher Motor Sales Co.*, 158 W. Va. 685, 213 S.E.2d 475 (1975). *See*

Syl. pt. 3, *State v. Haller*, 178 W. Va. 642, 363 S.E.2d 719 (1987).

The standard for permitting a lay witness to render an opinion was set out by this Court as follows:

> In order for a lay witness to give opinion testimony pursuant to Rule 701 of the West Virginia Rules of Evidence (1) the witness must have personal knowledge or perception of the facts from which the opinion is to be derived; (2) there must be a rational connection between the opinion and the facts upon which it is based; and (3) the opinion must be helpful in understanding the testimony or determining a fact in issue.

Syl. pt. 2, *State v. Nichols*, 208 W. Va. 432, 541 S.E.2d 310 (1999), *modified*, *State v. McCraine*, 214 W. Va. 188, 588 S.E.2d 177 (2003). Trooper Ellison's lay opinions easily satisfy *Nichols*.

To begin, Trooper Ellison testified that he was assigned to work with a special crime scene team. Trooper Ellison acknowledged that the team "received specialized training

---

[20](...continued)
a fact in issue.

in processing crime scenes and documenting it and securing evidence and packaging the evidence up[.]" During Trooper Ellison's testimony he was asked by the State to identify objects in specific crime scene photos. In one of the photos, Trooper Ellison identified a bullet hole in a wall and blood splatter on the wall. The State asked Trooper Ellison to explain the blood splatter:

> A. Uh, just whenever there's someone shot close up the — the blood splatter will be what — what happens after the bullet passes through the body and then the blood will actually make a certain pattern on the wall.

> Q. Okay. So this would have been blood from Ayanna after she was shot and the bullet passed through.

> [Defense Counsel]: Objection, your Honor. Move to strike unless they're going to qualify him in the field of blood splatter evidence or —

The trial court overruled the objection. The State followed up with one last question on the subject.

> Q. . . . Uh was there anything else that you needed to say about [photo] Number 7 or are you finished.

> A. Just like I said [I] just suspected that was the blood that come from the victim whenever, you know, whenever she was shot.

To the extent that Trooper Ellison rendered an opinion in this testimony, that opinion was simply that the blood spatter depicted in the photo was caused by a bullet that passed through Ms. Patton's body. This opinion was based upon Trooper Ellison's observations and particularized experience as a crime scene investigator. The opinion also

49

helped the jury understand how the blood was formed on the wall. Consequently, we find the testimony was admissible under Rule 701. *See United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) ("Because their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, we have no trouble finding that their opinions were admissible under Rule 701."); *Williams v. State*, 417 S.W.3d 162, 182 (Tex. App. 2013) (finding police officer properly gave lay witness opinion in describing crime scene).[21]

### G. Ruling Concerning Facebook Evidence

The next issue Mr. McKinley raises concerns a Facebook exhibit that the State listed in its exhibit list. Using a total of five sentences, Mr. McKinley appears to be arguing that, because of the late disclosure of the Facebook exhibit, "defense counsel changed trial strategy and severely damaged his relationship with his client by not using Facebook evidence, even that which he had obtained earlier."

---

[21]The second issue Mr. McKinley raised under this assignment of error is that Trooper Ellison improperly gave an expert opinion when he described the location of Ms. Patton's killer, based upon where shell casings were found. For the reasons stated regarding Trooper Ellison's blood splatter testimony, we find that his testimony as to the location of the shooter to be lay opinion testimony. As such, it was not error to admit the same. *See Barber v. State*, 143 So. 3d 586, 592 (Miss. Ct. App. 2013) (holding police officer's testimony in murder prosecution as to where bullets appeared to have impacted ground and where he recovered shell casings was admissible lay opinion testimony rather than expert testimony).

The State contends that the issue was waived because the record does not contain the Facebook exhibit, and because Mr. McKinley "is not positing a violation of discovery, but merely posits that the late disclosure caused a change in strategy and a rift between lawyer and client." We agree with the State that the issue was not properly preserved, but for different reasons. *See West Virginia Dep't of Health & Human Res. v. Clark*, 209 W. Va. 102, 105, 543 S.E.2d 659, 662 (2000) ("Thus, we affirm the decision of the circuit court, but for different reasons.").

The record reveals that the issue of the Facebook exhibit came up prior to the State calling its last witness during its case-in-chief. Defense counsel explained that he was not previously aware of the Facebook evidence. The State informed the court that the Facebook exhibit was listed on its exhibit list before the trial began. The State also indicated that, when the new prosecutor was appointed, he had assumed Mr. McKinley had received all information requested during discovery. Finally, the State made clear that it was not going to use the Facebook exhibit during the testimony of its last witness, and that the exhibit would only be used during its rebuttal if necessary. Once the State explained these matters, the court asked the defense counsel "[d]oes that satisfy your concerns?" Defense counsel answered, "Yes sir," that satisfied his concerns regarding the Facebook exhibit.

Assuming that Mr. McKinley raised a proper objection regarding the Facebook exhibit, the record is clear in showing that he withdrew that objection. Consequently, this

issue was not preserved for review by this Court. *See United States v. Echols*, 379 F. App'x 543, 544 (8th Cir. 2010) ("[D]efense counsel withdrew Echols's objections . . . [h]e therefore waived our consideration of those issues."); *Walker v. State*, 602 S.E.2d 351, 354 (Ga. Ct. App. 2004) (objection withdrawn; therefore issue waived on appeal); *Norris v. State*, 394 N.E.2d 144, 148 (Ind. 1979) ("[T]he objection to this evidence was withdrawn by the defendant . . . .  Therefore, appellant has waived this alleged error, unless he can show that failure to consider the issue would deny him fundamental due process."); *State v. Franklin*, 332 So. 2d 238, 239 (La. 1976) (objection was withdrawn; therefore issue waived on appeal).[22]

## IV.

## CONCLUSION

In view of the foregoing, we affirm the judgment below convicting Mr. McKinley of first degree murder and sentencing him to imprisonment for life, without the possibility of parole.

Affirmed.

---

[22]The last issue raised by Mr. McKinley is that the cumulative effect of the errors requires that he obtain a new trial. *See* Syl. pt. 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972) ("Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.").  In order to invoke the cumulative error doctrine, there must be more than one harmless error.  Mr. McKinley cannot rely on this doctrine because only one harmless error was found in this case.